IN RE ESTATE OF PETER RASMUSSEN.
CHARLES O. VANGEN, ADMINISTRATOR OF ESTATE
OF WALTER RASMUSSEN, AND ANOTHER v.
T. C. NELSON, EXECUTOR, AND ANOTHER.[1]

March 25, 1955.

No. 36,420.

[1]Reported in 69 N. W. (2d) 630.

216

*Peterson & Peterson,* for appellants.
*Hanson & Grinley* and *Elmer R. Peterson,* for respondents.

FRANK T. GALLAGHER, JUSTICE.

Appeal from an order of the district court denying a motion for judgment notwithstanding the jury verdict or for a new trial and for an order amending the findings of fact, conclusions of law, and order for judgment.

Peter Rasmussen died on January 17, 1953, a resident of Freeborn county, Minnesota. On February 11, 1953, T. C. Nelson, who was named as executor in decedent's last will and testament, petitioned the probate court for the allowance and probate of the will and for appointment of himself as executor. Prior to the hearing on this petition, Walter Rasmussen and Lawrence Rasmussen, brothers of decedent, filed objections to the allowance of the will. On June 13, 1953, the probate court made an order denying the objections of Walter and Lawrence, allowed the will to probate, and appointed T. C. Nelson executor thereof. That order then was appealed by the objectors to the district court. In connection with the trial, the court submitted the following interrogatories to the jury:

"Question 1. Was the testator, Peter Rasmussen, of sound and disposing mind and memory at the time of the execution of the will dated April 8, 1949?

"Answer: Yes.

"Question 2. Was the execution of said will of Peter Rasmussen procured by undue influence of Alfred T. Vollum?

"Answer: No."

At the conclusion of the trial the district court found that the will of Peter Rasmussen was signed by him at the time of the purported date of its execution on April 8, 1949, in the presence of two witnesses, Alfred T. Vollum and Jessie E. Morey; that testator signed the will in the presence of the witnesses; and that the witnesses signed as witnesses to the will in the presence of testator and in the presence of each other. It also adopted the finding of the jury to the effect that testator was of sound mind and memory and that the will was not procured by the undue influence of Vollum. The trial court concluded that the appeal of objectors should be dismissed and that the will should be allowed as the last will and testament of Peter Rasmussen, deceased.

Objectors assign as error that the court's finding that Peter Rasmussen was of sound and disposing mind and memory at the time of the execution of the will and that its execution was not procured by the undue influence of Alfred T. Vollum is not supported by the evidence.

■ With reference to the issue of testator's mental capacity at the time of the making of the will, we are confronted with the following well-settled principles. The mental capacity of a testator sufficient to make a valid will requires that at the time of making the will the testator must understand the nature, situation, and extent of his property and the claims of others on his bounty or his remembrance, and he must be able to hold these things in his mind long enough to form a rational judgment concerning them. In re Estate of Healy, 243 Minn. 383, 68 N. W. (2d) 401; In re Estate of Jernberg, 153 Minn. 458, 190 N. W. 990; In re Estate of Forsythe, 221 Minn. 303, 22 N. W. (2d) 19, 167 A. L. R. 1. The burden of proof to establish mental capacity rests upon the proponents of the will. The evidence and inferences therefrom must be viewed in the light most favorable to the findings of the court below. In re Estate of Healy, *supra.*

The controversy arose out of a $4,000 legacy to Lakewood Cemetery Association. It appears from the record that Rasmussen was hard of hearing, could not see too well, and had some difficulty in walking. On November 12, 1948, A. S. Lund was appointed guardian of Peter Rasmussen's person and estate. The guardianship was granted by an order of the probate court which read in effect that Rasmussen was unable and incompetent to care for and manage his property; that he then was approximately 78 years of age; that he had suffered from a paralytic stroke which affected his right side; and that he was physically unable to care for his property and needed personal care and attention.

Jessie Paulson, formerly Jessie Morey, testified on behalf of the proponents of the will that she had worked at various times for 25 years as a stenographer for lawyers and that in 1949 she was working for Vollum who was the attorney for Peter Rasmussen and his guardian, A. S. Lund. She was under the impression that she first met Rasmussen in March or April 1949 and claims that she had an opportunity to hear conversations between Vollum and Rasmussen on various other occasions. It was her opinion that Rasmussen was of sound mind and had the mental capacity to make a will. She said that he seemed like anyone else when he came into the office to transact business; that he knew what he wanted; and that he talked about an earphone on one occasion and said "I want to make my will."

T. C. Nelson, a Freeborn county commissioner, a former Albert Lea councilman, Lutheran Church trustee, school board member, and holder of other offices, as well as a former farmer and cattle buyer, testified that he had known Peter Rasmussen for 30 years or more and that he often visited with him and took him on errands after the latter was placed under guardianship. It was his opinion that at the time Rasmussen made his will there was nothing wrong with his memory; that he had the mental capacity to make a will; that Rasmussen knew that he had two brothers and had talked about them several times; and that he understood about his property. The court also asked Nelson the following:

"The Court: * * * Did Mr. Rasmussen in your judgment know what property he owned?

"A. Yes, sir, I am quite sure of that."

In contrast to the above testimony with reference to mental capacity, A. S. Lund, a witness for objectors, testified that Rasmussen's "memory was very bad, except on probably things way back. Those were pretty well fixed in his mind."

Nels Spangelo, who lived at the same rest home as Rasmussen, testified that he could not say whether Rasmussen would remember whether he had made a will two months after it was made. He did say, however, that Rasmussen's memory was very short and that, from the time he came to live at the rest home and from the time the will was made, his mental faculties were getting slower. On the other hand, the same witness admitted on cross-examination that he had talked with Rasmussen about his brothers, about his farm, about selling and getting back his farm, and about his assets, money, and bonds that he had in the "north side bank." He said that he had talked with Rasmussen three times over a period of a month and that on those occasions he remembered about making his will and did not seem to have any lapse of memory about it. Spangelo was then asked on cross-examination:

"Q. And he also knew that there was a four thousand dollar legacy in there for this cemetery, told you so?

"A. Well, after Mrs. Raben had told him precisely that four thousand dollars was in there.

"Q. Well, Mrs. Raben wasn't present when you were talking to him?

"A. No.

"Q. So I would like not to argue with you, Nels, but when he talked to you alone he mentioned about the four thousand dollars?

"A. Yes.

"Q. So he knew about that?

"A. He knew about that."

Agnes Raben, who owned and operated the rest home at which Rasmussen was staying, testified that he had a stroke in December

1948 and that after this stroke his memory "was blurred, like it seemed harder to put things across to him, and harder for him to understand" and that there was very little improvement in his memory by April when the purported will was made. When asked "Well, was his mind such that you think he would appreciate or understand just what he had would amount to in dollars and cents?" she replied, "I think not. I don't know how he could."

It will serve no useful purpose to go over all the conflicting testimony in the record. The fact-finding function in cases of testamentary capacity is in the trial court. In a case such as this, where the weight of the evidence depends in a large measure upon the appearance and interest of the witnesses, the trial court is peculiarly qualified to discharge the fact-finding function. In re Estate of Hartz, 237 Minn. 313, 54 N. W. (2d) 784; In re Estate of Olson, 227 Minn. 289, 35 N. W. (2d) 439. Under well-settled rules, the trial court's finding upon this fact issue is binding upon us if such finding is not clearly and manifestly against the evidence. In re Estate of Crosby, 218 Minn. 149, 15 N. W. (2d) 501. In our opinion the trial court's finding of testamentary capacity must be upheld. Under the testimony of T. C. Nelson there is evidence from which the trial court could have concluded that Rasmussen sufficiently knew the nature and extent of his property. This also might have been inferred from the cross-examination of Spangelo. As to Rasmussen's knowledge of the natural objects of his bounty, witnesses from both sides testified that he knew of his two brothers and had talked of them. Viewing the evidence in the light most favorable to the finding, we cannot say that the evidence was not sufficient to support the finding or that it clearly and manifestly was against the evidence.

■ With reference to the question whether any undue influence was exercised on the part of Alfred T. Vollum, Jessie Morey Paulson, his secretary, claimed that, on one occasion when Rasmussen came to see the attorney about certain guardianship matters and an earphone, he also said that he wanted to make a will and that Vollum asked him how he wanted to make it. According to her testimony, Rasmussen said that he wanted to leave some of his property to his

brothers, but not all of it, and that he wanted to leave part of it to someone else. It appears that he was undecided at that time, so, according to the witness, Vollum told him to come back later when he had decided on the matter and they could talk about it some more. She said that she was present during other conversations when Rasmussen was trying to explain to his attorney how he wanted to make his will. She said that she typed the will and, in arriving at what she should type, Vollum first talked it over with Rasmussen, who was hard of hearing, which necessitated the reading of the items "over and over again." She claims that in doing this Vollum would say "are you sure that is the way you want it?" While she could not remember at the time she testified as to just how Rasmussen wanted his property to go, she said that "he made it understood to Mr. Vollum that he wanted to leave it to some good cause, and he didn't know just who." She admitted that Vollum suggested that perhaps Lakewood Cemetery would be a good cause and that Rasmussen agreed. She then testified that when the will was signed Vollum read it aloud again to Rasmussen.

While there is testimony on the part of the objectors indicating many of the things which courts may consider in arriving at a finding of undue influence, we have carefully reviewed the record here to determine whether there was any such undue influence in the case at bar to justify a reversal of both the probate court, the district court, and the finding of the jury that the execution of the will of Peter Rasmussen was not procured by the undue influence of Alfred T. Vollum. It is our opinion that there was not.

To invalidate a will, undue influence must be such as to substitute the will of the person exercising it for that of the testator, thereby making the written results not the will of the testator. It must be equivalent to moral coercion or constraint overpowering the will of the testator and must operate at the very time the will is made and dominate and control its making. Mason's Dunnell, Minn. Probate Law (2 ed.) § 167; In re Estate of Marsden, 217 Minn. 1, 13 N. W. (2d) 765, and cases cited therein.

Undue influence is a question of fact and, in determining that fact, the court may consider opportunity to exercise it, active par-

ticipation of the person exercising it in preparation of the will, confidential relationship between the person executing the will and the party exercising the influence, disinheritance of those whom the testator probably would have remembered in his will, singularity of the provisions of the will, and the exercise of influence or persuasion to induce the testator to make the will in question. In re Estate of Wilson, 223 Minn. 409, 27 N. W. (2d) 429.

Objectors urge in their brief that all of the above conditions are supported by the evidence. Even if this be conceded, the existence of those conditions alone or combined only create a presumption (in some states inference) of undue influence.[2] Minnesota has not passed on the question whether they create presumption or inferences of undue influence. However, we have held that, where the evidence supports affirmative findings with respect to all these factors, it justifies a finding of ultimate fact that the will of decedent was induced by undue influence. In re Estate of Wilson, 223 Minn. 409, 27 N. W. (2d) 429.

In the case at bar it readily can be seen that the testimony on this issue is conflicting. However, there is evidence directly bearing on the part played by Vollum at the time of the execution of the will. The testimony bears out that testator went to Vollum of his own free will and asked to have his will drawn up; that he was at the office twice discussing the matter; that at the signing of the will every provision was read loudly and one at a time until decedent understood it; and that he stated that he wanted to give some of his property to a good cause. While it is true with respect to his wanting to give to a good cause that Vollum suggested Lakewood Cemetery, this mere suggestion hardly could be said to have destroyed the free agency of the testator and substituted the will of Vollum therefor. A testator may be influenced by others in making his will, but he must not be unduly influenced. Mason's Dunnell, Minn. Probate Law (2 ed.) § 167. This court will not set aside the findings of the trial court or of the jury as to undue influence unless they are mani-

---

[2]For an extended discussion of when these conditions establish presumptions or inferences, see Annotations, 66 A. L. R. 228 and 154 A. L. R. 583.

festly and palpably contrary to the evidence. It will not do so merely because it would have found differently had the question been submitted to it originally. Mason's Dunnell, Minn. Probate Law (2 ed.) § 174, and cases cited therein. Therefore, in our opinion the trial court was presented with a question of fact, and it has discharged its fact-finding function without error. We cannot say that its finding of fact with reference to undue influence is manifestly and palpably contrary to the evidence in the record.

Objectors also urge that the evidence allegedly proving that Vollum refused to return the will or to draw up a codicil is strong evidence of undue influence. With reference to that testimony, A. S. Lund, Rasmussen's guardian, claimed that after a visit with Rasmussen he learned that the latter did not want to make a gift of $4,000 and that upon learning this he called Vollum and told him that Rasmussen wanted his will returned. The witness then said that he and Vollum later visited Rasmussen and that Rasmussen then told Vollum that he wanted his will back. It appears, however, that Vollum did not have the will with him at the time. Lund further claims that he and Vollum again went to see Rasmussen and that there was no change in Rasmussen's attitude at that time. He further claims that it was then agreed that the will would be returned to Lund or that a codicil would be submitted to him setting out what Rasmussen wanted to accomplish. It appears, however, that thereafter no further steps were taken by Lund to get possession of the will, and, although Rasmussen lived for some two years afterward, neither he nor Lund ever made any further attempt to reclaim the will or change the bequests. It is difficult for us to see at this late date why something was not done in the matter if Rasmussen was as profound in his determination that he wanted a change made as is indicated by the testimony of Lund and other witnesses for the objectors. No case has been found holding that the refusal of an attorney to return a will or make a codicil establishes that undue influence has been exercised at the time of the making of the will. Such facts well may have a direct bearing on whether fraud or duress has been practiced in preventing the revocation of a will. While it is doubtful that the record could be said to establish

this, the issue was neither litigated below nor argued on appeal. We therefore are unable to pass on the question.

Affirmed.