IN RE ESTATE OF THOMAS REAY.
CLARA E. YORK AND ANOTHER v. ARTHUR ELLIS REAY.

81 N. W. (2d) 277.

February 21, 1957—No. 36,999.

*Kief & Kief,* for appellants.
*Nelson & Oyen,* for respondent.

MATSON, JUDGE.

Appeal from an order denying a new trial in a will contest proceeding wherein the district court made findings that the will was not procured by undue influence and admitted the will to probate.

Since the existence of undue influence is a question of fact for the trier of fact,[1] the sole issue upon this appeal is whether the findings of fact by the trial court are sustained by the evidence.

Testator Thomas Reay, an 85-year-old widower, died on June 28, 1955, a resident of Chippewa County. He was survived by a son, Arthur Ellis Reay, and by two daughters, Clara and Mabel. The daughters are the contestants and appellants and the son is the respondent herein.

[1]See, In re Estate of Rasmussen, 244 Minn. 215, 69 N. W. (2d) 630; In re Estate of Forsythe, 221 Minn. 303, 22 N. W. (2d) 19, 167 A. L. R. 1; 20 Dunnell, Dig. (3 ed.) § 10243b.

Under the will the son was bequeathed and devised property of the approximate value of $38,000, consisting of a 160-acre farm worth about $29,600 and cash moneys of about $8,730. The two daughters were bequeathed as their sole share the sum of $1,700 each to be paid to them within three years by the son out of his share.

Overruling the objections of the contestants to the allowance of the will on the grounds of mental incapacity and undue influence, the probate court allowed the will and appointed the son executor. Upon appeal, the district court, having found that the decedent was of sound mind and free of undue influence when he made the will, affirmed the order of the probate court. Appellant-objectors' motion for amended findings or a new trial was denied, and from the denial of a new trial we have this appeal. The only issue asserted for review is that of undue influence.

Testator's 42-year-old daughter, Clara, married in 1940 and thereafter lived away from her father's home and farm with the exception of a two-year period during World War II when her husband was in service. The youngest daughter, Mabel, now of the age of 39 years, shortly after her mother's death in 1947, moved from her father's home and lived thereafter with her sister Clara until she married in 1951.

Testator's 44-year-old son, Arthur Ellis, has spent his entire life (with the exception of the first six months) living and working on the family farm. After his marriage in 1939, he and his wife lived in a smaller house, which was at that time built for him on the farm. About 1952, the son and his family moved into the regular farmhouse and the father moved into the smaller one. After the father reached the age of 70 years he did very little of the farmwork and, with the exception of minor chores, he left the heavy farmwork, such as putting in and harvesting the crops and caring for the cattle, to his son. As time passed, the father did less and less of the smaller chores. The son's wife cooked for the decedent and did his laundry and housecleaning. There is ample testimony upon which the trial court could find that the decedent was deeply grateful to his son and his daughter-in-law for the good care they had given him in his old

age and that he had, on occasions prior to his death, told others that his son had been a good boy who hadn't received much out of the farm operations and that he was therefore leaving the farm to him.

■ Before examining the evidence indicative of undue influence, we turn to a résumé of the controlling legal principles. He who attacks the validity of a will on the ground of undue influence bears, *throughout the entire trial*,[2] the burden of proving undue influence by proof that is clear and convincing.[3] Undue influence to invalidate a will must, at the very time the will is made, operate with such dominant and persuasive force that the will of the person exercising it is substituted for the will of the testator whereby the resulting written testament expresses the intent and purpose of that person and not that of the testator.[4]

■ Although the evidence to prove the subordination of the will of the testator to the control of another may cover a wide range and usually is circumstantial, the requisite clear and convincing proof of undue influence is not established merely by a showing of motive, opportunity, or disposition to use undue influence, or by showing the existence of a confidential relationship with the testator, or by revealing the inequality or unjustness of the will, or by a showing of a combination of any or all of these evidentiary factors. The evidence must go beyond suspicion and conjecture and show, not only that the influence was in fact exerted, but that it was so dominant and controlling of the testator's mind that, in making the will, he

[2]In re Estate of Mollan, 181 Minn. 217, 232 N. W. 1; In re Estate of Olson, 176 Minn. 360, 365, 223 N. W. 677, 679; In re Estate of Jernberg, 153 Minn. 458, 190 N. W. 990; In re Estate of Simmons, 156 Minn. 144, 194 N. W. 330; In re Estate of Keeley, 167 Minn. 120, 208 N. W. 535.

It is both useless and erroneous to cite Fischer v. Sperl, 94 Minn. 421, 103 N. W. 502, to the contrary since the dicta in that case has been distinguished and modified by subsequent cases such as the Keeley, Jernberg, Simmons, and Olson decisions above cited.

[3]Borstad v. Ulstad, 232 Minn. 365, 45 N. W. (2d) 828; 20 Dunnell, Dig. (3 ed.) § 10238.

[4]In re Estate of Marsden, 217 Minn. 1, 13 N. W. (2d) 765; 20 Dunnell, Dig. (3 ed.) § 10238.

ceased to act of his own free volition and became a mere puppet of the wielder of that influence.[5]

■ Since the decedent's mental capacity to make a will is not challenged upon this appeal, we are concerned with evidence as to his mental condition only to the extent that such evidence reasonably tends to show that he, though possessed of testamentary capacity, was mentally weak or infirm to a degree which made him susceptible to undue influence.[6]

■ Contestants rely heavily on the fact that their brother, Arthur Ellis, accompanied their father to the lawyer's office and that he was present in the same room not only when the testator was discussing with his attorney the changes to be made in a former will but also when the resulting new will was signed. Although no court can approve of the practice of permitting a beneficiary under a contemplated will to be present when the provisions thereof are discussed with an attorney, or when the instrument is signed, his mere presence does not of itself establish undue influence. Opportunity to exercise undue influence is not proof of its existence. In this case the attorney testified that Arthur Ellis did not participate in the conversations and that the testator himself, without suggestion from anyone, directed what he wanted done. The attorney, who had known the testator for about 35 years, said that he observed no change in the testator's mental faculties and that "*he was always in good shape mentally.*" (Italics supplied.) The evidence shows that he was not only at all times possessed of a sound mind but of an independent and strong mind that could not be easily influenced. One of the contestants in fact admitted that it was difficult to change the mind of her father about anything.

Testator's conduct during his final years is indicative of a man who was at all times self-reliant and able to handle his own affairs.

_____

[5]In re Estate of Marsden, 217 Minn. 1, 10, 13 N. W. (2d) 765, 770; In re Estate of Mazanec, 204 Minn. 406, 411, 412, 283 N. W. 745, 747, 748; 20 Dunnell, Dig. (3 ed.) §§ 10239, 10240, 10243.

[6]See, In re Estate of Marsden, 217 Minn. 1, 15, 16, 13 N. W. (2d) 765, 773; In re Estate of Olson, 227 Minn. 289, 35 N. W. (2d) 439; 20 Dunnell, Dig. (3 ed.) § 10239.

In 1954, he conducted his own negotiations in buying a new car. He drove his own automobile and traveled by himself in making frequent visits to his daughter and in making other calls. All by himself, he would take the bus to Minneapolis and from there take the train to visit friends in Iowa. There is testimony that he would sometimes confuse the names of his grandchildren and that he was repetitious in relating his past experiences. A certain degree of forgetfulness in remembering names, as well as a tendency to repetition in relating past events, is characteristic of many elderly people and is of little significance as indicating either testamentary incapacity or susceptibility to undue influence. It is true that in his final years he let his son look after certain bookkeeping operations pertaining to the farm; it can well be understood, however, that he desired to be relieved of these details. No particular significance is to be attached to the fact that in March 1952 he gave his son a bill of sale to the farm machinery—apparently as an outright gift—and that the bill of sale was kept by him in his safety deposit box. His retention of the bill of sale is as consistent with a desire on his part to protect his son from future disputes as to the ownership of the farm machinery as with a desire to retain it in the expectation of future payment.

It is significant that the will drawn in 1953, except as to minor changes, was closely similar to the one drawn in 1950. Respondent was not present when the 1950 will was made. Respondent's share was the same under both wills and under both instruments he was given three years in which to pay his sisters their share. The only change made by the new will related to bequests to the contestants. In the 1950 will, the one daughter was bequeathed $3,000 and the other $400. The 1953 will gave each of them $1,700.

■ Respondent frankly admitted that in 1950 or 1951, at a time when he did not know how much his father planned on giving his sisters, he requested that he be given some time in which to pay them their shares. This request is but an evidentiary straw which does not weigh heavily as indicative of undue influence either in the making of the will as a whole or in the formulation of the specific pro-

vision giving the son three years in which to pay off the contestants. Entreaty, importunity, suggestion, or request for special consideration does not constitute undue influence unless it is so persistent and strong that it amounts to a degree of moral coercion and constraint which controls or destroys the independent will of a testator.[7] A particular provision of the will, or a will as a whole, is not invalidated merely because the testator was influenced by the request or suggestion of either a beneficiary or of a third party as long as he was not unduly influenced.[8] Here the request was made in a manner which indicated respect for the testator's independence of mind and for his right and power to dispose of the estate as he saw fit.

Likewise, the fact that there was great inequality between the bequests to the daughters and the provisions made for the son is not controlling. The trial court, in the light of the evidence of a whole, could well find that the son had labored his entire life on the farm, with little more than a bare living as his compensation, and that the father was deliberately and justifiably rewarding him—and his daughter-in-law—for many years of faithful service and for the considerate care which he had received from them in his old age.

■ We have not overlooked certain other items of evidence but deem it unnecessary to review them in detail. The evidence unquestionably sustains the trial court's finding that the will was not procured by undue influence. The existence of undue influence is a question of fact, and the supreme court will not set aside the findings of the trial court as to undue influence unless they are manifestly and palpably contrary to the evidence as a whole, and this holds true even though this court might have determined otherwise if it had heard the case de novo.[9]

The order of the trial court is affirmed.

Affirmed.

---

[7]20 Dunnell, Dig. (3 ed.) § 10238, and numerous cases therein cited.

[8]See, In re Estate of Rasmussen, 244 Minn. 215, 222, 69 N. W. (2d) 630, 636.

[9]Borstad v. Ulstad, 232 Minn. 365, 45 N. W. (2d) 828; In re Estate of Rasmussen, 244 Minn. 215, 69 N. W. (2d) 630; 20 Dunnell, Dig. (3 ed.) § 10243b.