IN RE ESTATE OF HERMAN PUNDT.
ELIZABETH TUIL AND OTHERS v.
MINNIE KELSTROM AND ANOTHER.

157 N. W. (2d) 839.

April 5, 1968—No. 40,786.

*Willette, Zeug & Kraft* and *James E. Zeug,* for appellants.
*Keefe & Schantzen* and *Milton D. Schantzen,* for respondents.

KNUTSON, CHIEF JUSTICE.

This is an appeal from an order denying a motion for amended findings of fact, conclusions of law, and order for judgment or, in the alternative, for a new trial in an action involving the admission of the will of Herman Pundt to probate.

Herman and Robert Pundt were bachelor brothers who lived and farmed together in Renville County. Minnie Kelstrom was their housekeeper for more than 30 years, beginning in 1930. For this she was paid $500 per year and her board and room. Merland Kelstrom is her grandson and has lived with the Pundts since he was 3 years old. In 1961 Merland was paid $50 per month plus the profit from 80 acres of the Pundt farm which he operated. He was 27 years old at the time of trial of this case.

On February 21, 1961, Robert Pundt asked Merland to go to Hutchinson, Minnesota, and request Elmer Jensen, a local attorney, to prepare wills for Robert and Herman. According to the testimony of both Merland and Robert, the terms of the will were not discussed between them before Merland went to see Jensen.

On the next day, February 22, Jensen went to the Pundt farm. He took with him H. R. Kurth, then an employee of a Hutchinson bank, as a witness. Robert Pundt was sick in bed at the time, and both he and Herman executed wills on that day. Each will provided that the estate, which consisted mainly of 200 acres of farmland owned by each of the brothers, would go to Minnie Kelstrom, or, if she predeceased the testators, to Merland Kelstrom.

Herman Pundt died September 20, 1964. Attorney Jensen had predeceased Herman, but after Herman's death Robert went to what had been the Jensen law office, then occupied by another attorney, and procured a carbon copy of Herman's will. It is undisputed that this copy was properly executed and was the one offered for probate. There is dispute in the evidence as to whether one or two wills were executed when Jensen was at the Pundt farm, but only the carbon copy was found. Two of Jensen's former secretaries testified that it was his invariable practice to have two copies of wills prepared, and that if they were not left with the testator they were placed in separate envelopes, one marked

"original" and one, "copy," and placed in his safe. Mrs. Sandra Demenge, Jensen's secretary at the time the Pundt wills were prepared, testified that Jensen went to the Pundt home, received the information about what the wills were to contain, and dictated them to her. She typed them, and then he took them to the farm home for execution. There is considerable testimony in the record to show that Jensen did some typing at the kitchen table at the home, and Robert seemed to be of the opinion that the wills were prepared at the Pundt home while Jensen was there. Although the testimony of the witnesses was not clear, due to their lapse of memory, the testimony of both Mrs. Kelstrom and Robert Pundt was that no copy of the will was left at the Pundt home, and, whether one or two copies were executed, Jensen took all copies with him.

The carbon copy of Herman Pundt's will was offered for probate and admitted over the objection of legal heirs of Herman. On appeal to the district court, the order of the probate court admitting the will to probate was affirmed. The questions here are whether Herman Pundt's will was executed as the result of undue influence of Minnie Kelstrom or Merland and whether, if properly executed, it was revoked prior to his death.

■ It would seem that appellants have abandoned the claim of undue influence as it is not argued in their brief. Ericksen v. Wilson, 266 Minn. 401, 123 N. W. (2d) 687. However, respondents have discussed it in their brief, so we may briefly dispose of it here even in the absence of a discussion by appellants. Cordell v. Chanhassen Auto Body, 269 Minn. 103, 130 N. W. (2d) 362. It is sufficient to say that the evidence in the record is wholly insufficient to support a claim of undue influence. The rules regarding undue influence are as well stated in In re Estate of Reay, 249 Minn. 123, 126, 81 N. W. (2d) 277, 280, as anywhere. We said there:

"* * * He who attacks the validity of a will on the ground of undue influence bears, *throughout the entire trial*, the burden of proving undue influence by proof that is clear and convincing. * * *

"* * * The evidence must go beyond suspicion and conjecture and show, not only that the influence was in fact exerted, but that it was so dominant and controlling of the testator's mind that, in making the

will, he ceased to act of his own free volition and became a mere puppet of the wielder of that influence."

Here there is no evidence of any attempt by Mrs. Kelstrom or Merland to exercise any undue influence. She had worked for both Pundt brothers for over 30 years and, as Robert said, "She'd been good to us." She was paid small wages. There is nothing strange about the fact that as they neared the end of their lives they wanted to reward her—and if she predeceased them, her grandson—for these many years of faithful service. There is no showing that any of the relatives had been close to either of the brothers or had done anything for them. Under these circumstances, the court's finding that there was no undue influence is more than amply supported by the evidence.

■   On the question of revocation, Minn. St. 525.19 reads:

"No will in writing shall be revoked or altered otherwise than by some other will in writing; or by some other writing of the testator declaring such revocation or alteration, and executed with the same formalities with which the will itself was required by law to be executed; or unless such will be burnt, torn, canceled, obliterated or destroyed, with the intent and for the purpose of revoking the same, by the testator himself or by another person in his presence by his direction and consent. When so done by another person, the direction and consent of the testator and the facts of such injury or destruction shall be proved by at least two witnesses. Nothing in this section shall prevent the revocation implied by law from subsequent change in the condition or circumstances of the testator."

There is no evidence that if two copies of the will were executed Herman Pundt revoked the will in accordance with the statute. Appellants rely largely on a presumption that if a will is left in the possession of the testator and it cannot be found after his death, it is presumed to have been revoked by him. In re Estate of Havel, 156 Minn. 253, 194 N. W. 633. Appellants urge that the same presumption should apply when a testator has executed a will in duplicate, relying on the general rule stated in Annotation, 17 A. L. R. (2d) 814:

"The general rule that where a will which cannot be found following

the death of the testator *is shown to have been in his possession when last seen,* the presumption is that he destroyed it animo revocandi, is usually held applicable in instances where two or more duplicate original wills were executed, with the result that where one of the duplicates is traced to the possession of the testator prior to his death, there is, if such duplicate cannot be found after testator's death, a rebuttable presumption that he destroyed it with the intention of revoking both it and any other duplicates." (Italics supplied.)

The rule, even if we accept it, does not apply to the facts of the present case because there is no direct evidence to show that either copy of the will was left in Herman's possession. Both Minnie Kelstrom and Robert Pundt testified without equivocation that no copy of the will was left at the Pundt home. There is nothing to show that Herman ever had in his possession either copy of the will, if two copies were executed. It is obvious that the carbon copy was not left at the Pundt home, because it was found in the office of Jensen after Herman's death and after the death of Jensen. The crucial testimony of Robert follows:

"Q. Did you see how many copies Herman signed?

"A. No.

"Q. You didn't see how many copies Herman signed of the will?

"A. Just one.

"Q. He just signed one copy of the will?

"A. Yah.

"Q. You're sure of that, that he didn't sign two?

"A. No.

"Q. Then what did Elmer [Jensen] do with the wills?

"A. He took it to town.

"Q. Elmer took the wills with him?

"A. Yes.

"Q. Did he leave any copy of a will with you?

"A. No.

"Q. Did he leave any copy of Herman's will with him?

"A. No."

The two brothers continued to live together after the execution of the

wills and it is reasonable to suppose that, had a copy of Herman's will been left with him, Robert would have known about it and that he would also have known if Herman decided to revoke his will. Robert continued his will in effect and even made a new will with the same terms after Herman's death. It was still his desire that his property go to Mrs. Kelstrom. Thus the requisite proof that a copy of the will remained in the possession of Herman is missing, and the rule cannot apply. It is as likely to suppose that, if two copies of the will were executed, one was lost in the office of Jensen as that one was destroyed by Herman with intent to revoke the will. Had he intended to revoke his will, in all likelihood he would have procured the copy from Jensen and destroyed that, too.

Under these circumstances it must follow that the decision of the trial court must be and is affirmed.

Affirmed.