**In re ESTATE OF G.J. LARSON, a.k.a. Gunard Larson.**

**No. C1–86–666.**

Court of Appeals of Minnesota.

Oct. 21, 1986.

Review Denied Dec. 12, 1986.

Ronald H. Schneider, Schneider and Kallestad, Willmar, for appellant.

Warrenn C. Anderson, Gerald J. Seibel, Fluegel, Anderson, Dalager, Dalager & Seibel, Chtd., Morris, for respondents.

Heard, considered and decided by FORSBERG, P.J., FOLEY and LANSING, JJ.

## OPINION

FORSBERG, Judge.

This is an appeal from an order denying a motion for a new trial or amended findings following an order for judgment in favor of the opponents of a will. The trial court, hearing the matter without a jury, determined that the will was the product of undue influence exerted by appellant John Larson. We affirm.

## FACTS

The testator, Gunard J. Larson, died on March 17, 1984, at age 77, survived by eight children. His wife had predeceased him. The will submitted for probate left the entire estate to Larson's son, appellant John Larson, and his wife, Darlene, or to their children if John and Darlene predeceased him. Five of Gunard's other surviving children, and the children of a daughter who predeceased him, contested the will, claiming that Gunard lacked testamentary capacity and that he was unduly influenced by John in making the will. Two other surviving children did not join in the contest.

After his wife died in November, 1980, Gunard sold his farm to John and Darlene. He remained healthy and active, living independently in an apartment in Cyrus, Minnesota until November of 1982 when he experienced heart problems and underwent coronary bypass surgery.

Following the surgery, Gunard remained in the hospital until late January of 1983 when he moved back into the apartment in Cyrus. John's son Steve moved into the apartment to cook and care for him. John and his sister, Marjorie Alfson, also provided care. Marjorie additionally did much of the cleaning, and handled the financial problems resulting from Gunard's hospitalization. All of Gunard's children visited him in the hospital, either in Minneapolis or later in Morris.

In March of 1983, Gunard was again hospitalized and later taken to a nursing home in Morris. His mental and physical condition had substantially deteriorated.

He had lost a considerable amount of weight and was physically and mentally weak. He also appeared confused at times.

All the children agreed that Gunard detested staying in the hospitals and nursing home. Dr. Stock, Gunard's physician, noted that Gunard's overriding concern was to get out of the hospital. John testified that during the second hospital stay he had told Gunard that he would only have to stay in the nursing home until the spring farm work was completed, and then he could come to live on the farm. The other children testified that they were unaware of this plan until after Gunard was moved to the farm on April 13th.

It was apparent to everyone, however, that since Gunard could no longer care for himself, he would not be returning to his apartment. On April 11th the children gathered there to divide Gunard's personal property.

According to John, Gunard had told him that they should divide the property by lot, with no payment for any of the items. Although the bulk of the property was distributed by lot in accordance with Gunard's wishes, a small portion of the personal property was "auctioned" among the siblings. John himself bid for a hutch and an iron. Several of the children made no bids.

Following the distribution, some of the Larson children discussed Gunard's care, his bill at the nursing home, the possibility of taking him out to John's farm, and what John and Darlene should receive for his care. This discussion became very heated when a disagreement arose over how much John should be paid for taking care of his father. Donna and Charles testified that during the course of the argument John told them he could "have dad's will changed any time."

The following day, April 12, John went to see his father at the nursing home. According to John's testimony, Gunard had asked him to report on the distribution of his personal property. John told him, "Well, it didn't go the way you wanted it to." He then told Gunard,

Well, they didn't like the idea of dividing this stuff up, with just giving it away. They wanted to put it [through] an auction.

This upset Gunard.

John admitted he knew Gunard would be upset by his report of the children's "auction." He did not, however, tell Gunard that he himself had bid on some items, nor that some of the children had not participated, nor that the items "auctioned" were relatively insignificant in relation to the total value of the items distributed.

John testified that on several occasions his father had talked of leaving everything to him, most recently in February, 1983. His son Steve, who was living in Gunard's apartment at the time, corroborated John's testimony concerning that conversation. John stated he had declined the "offer" because it would cause a fight in the family. After having told his father of the auction, however, John brought up the offer, stating,

Dad, if the offer still stands, I'm ready to accept everything.

John testified that following this conversation about the "auction," Gunard told John to get a lawyer. John went to the Martin and Nelson firm in Morris, which Gunard had suggested, and made an appointment for that afternoon. Before meeting with Gunard's attorney, John went to their joint safe deposit box to retrieve Gunard's will, which he later destroyed.

John then brought Gunard to meet with Lowell Nelson. John and Gunard sat together during this meeting, although Gunard himself explained his desire to change the 1980 will. Nelson noted it would be "an unpopular will," and, anticipating a later claim of incapacity, suggested Gunard see a physician. John made an appointment with Dr. Stock, and brought Gunard there that afternoon. Later, they returned to Nelson's office. The will had been prepared, and Gunard signed it (outside of John's presence).

That night when John was reading the will, he noticed that his sister Cheryl's

name had not been included among the names of those children disinherited in the will. John informed his father of this, and called the law office the next day to report the error and inquire of its significance. A new will was prepared to specifically exclude Cheryl along with the rest of the children. Gunard came in the next day to sign it, unaccompanied by John. The lawyer and two witnesses agreed that Gunard seemed to be of sound mind, to be acting voluntarily, and to understand the effect of the will, although it was not read to him.

On April 13th, the day the corrected will was signed, Gunard left the nursing home and moved out to John's farm. That night, according to the testimony of Orrin Alfson, a son-in-law, Gunard stated during a conversation at the farm that he had been to an attorney's office that day and had signed some papers. John then angrily told his father, "you weren't in no attorney's office and you didn't sign no papers." John's denial of this conversation at trial was equivocal and confused. John admitted that he had the ability to affect the decisions his father made, and that the will probably would not have been changed had he not suggested his willingness to accept the "offer" of taking everything.

## ISSUE

Did the trial court err in concluding that the will was the product of undue influence?

## ANALYSIS

To establish a claim of undue influence, the evidence must show

> not only that the influence was in fact exerted, but that it was so dominant and controlling of the testator's mind that, in making the will, he ceased to act of his own free volition and became a mere puppet of the wielder of that influence.

*In re Estate of Reay*, 249 Minn. 123, 126–27, 81 N.W.2d 277, 280 (1957) (footnote omitted).

The following factors bear upon a finding of undue influence:

> the opportunity to exercise [undue influence], active participation in the preparation of the will by the party exercising it, a confidential relationship between the person making the will and the party exercising the influence, disinheritance of those whom the decedent probably would have remembered in his will, singularity of the provisions of the will, and the exercise of influence or persuasion to induce him to make the will in question.

*In re Estate of Wilson*, 223 Minn. 409, 413, 27 N.W.2d 429, 432 (1947).

In this case, John admitted he was able to exert influence over Gunard. Indeed, John had many opportunities to do so and by direct evidence of John's own testimony, it is clear that influence was exerted.

There is no question that John actively participated in the preparation of the will. It was John who suggested Gunard change the will, who retrieved and destroyed the old will, who worked out the details with the lawyers and doctors, and who arranged to have Cheryl specifically excluded from the will. John's extensive participation in the events surrounding the execution of the will is relevant in gauging the degree of his dominance over Gunard. *Cf. Matter of Estate of Rechtzigel*, 385 N.W.2d 827, 832–33 (Minn.Ct.App.1986) ("participation" was relevant to whether influence was exercised).

A confidential relationship existed between John and Gunard, however, this negates, rather than proves, undue influence between blood relatives. *In re Estate of Anderson*, 379 N.W.2d 197, 201 (Minn.Ct. App.1985), *pet. for rev. denied* (Minn. Feb. 19, 1986).

It is relevant to an inference of coercive influence that Gunard's final will left everything to John and his family and specifically disinherited all the other children and their families. The attorney who drafted the will testified that it is not uncommon for a farmer's will to favor the child who carries on the family farming operation. The trial court found "that the decedent normally would have remembered all of his children, [except Cheryl, who was

a ward of the state], and would not have intended to disinherit them." The 1980 will had disinherited Cheryl because she was receiving state care. There was also testimony of a previous will disinheriting all the children except Cheryl and Gloria. Despite this evidence, however, there was sufficient evidence to support the trial court's finding that the will's provisions were singular, and disinherited those whom Gunard normally would have remembered. There was much evidence that all the children had a close and loving relationship with their father. There was no evidence of family rancor sufficient to cause Gunard to favor John and his family to the exclusion of all his other children and grandchildren.

The actual exercise of undue influence must often be proved by circumstantial evidence, since direct evidence is usually unobtainable. *In re Estate of Olson*, 176 Minn. 360, 365, 223 N.W. 677, 679 (1929). Here, there was considerable testimony that Gunard, previously a strong-willed person, was much more mellow and malleable after his heart attack in November, 1982. Gunard was determined, however, in his opposition to further hospitalization or nursing home care. It was John alone who offered Gunard the means to avoid further institutionalization. John's extensive participation in the execution of the new will after his slanted reporting of the "auction" can be seen as a means of maintaining control or dominance over his father. Gunard's departure from the nursing home and move to John's house the day after the will was changed also permits an inference of domination. In addition, John admitted that he was able to exert influence over Gunard, and that he had done so in the past. Finally, the trial court credited Orrin Alfson's testimony that Gunard's mention of the new will was angrily cut off by John. This attempt to conceal creates a further inference of coercion, domination and control.

The trial court's findings on undue influence are not to be set aside unless clearly erroneous. *Estate of Anderson*, 379 N.W.2d at 200. The trial court made no finding as to whether Gunard had ever made an offer to leave John everything in his will. However, the evidence is sufficient to support the court's finding that Gunard was unduly influenced, even if conversations involving such an offer had occurred.

## DECISION

The trial court did not err in finding the will was the product of undue influence.

Affirmed.