**In re The ESTATE OF Esther M. OPSAHL.**

No. C9–89–1059.

Court of Appeals of Minnesota.

Nov. 28, 1989.

David A. Barnes, Minneapolis, for appellants.

Steven E. Drange, Litchfield, for respondent.

Considered and decided by RANDALL, P.J., and FOLEY and LANSING, JJ., without oral argument.

## OPINION

RANDALL, Judge.

The proponents [1] of a will executed by decedent Esther M. Opsahl on November 3, 1987, appeal from a judgment denying formal probate of the will. The trial court found that the will proponents exerted undue influence upon decedent to obtain execution of the will. The proponents also challenge the trial court's refusal to authorize the use of estate funds to pay attorney

---

1. The will proponents are Donald Opsahl, personal representative of the estate, Romel Lembke, Russell Opsahl, Alfred Opsahl, Ardis Andrews and Grace Grover. All of these individuals are decedent's children. The principal actors on behalf of the proponents are Donald Opsahl, Romel Lembke, and, to a lesser extent, Russell Opsahl.

fees incurred in the will contest. We affirm.

## FACTS

Decedent executed three wills during her lifetime. The first was executed in 1976 and was prepared by attorney Ronald Thomton. This will evenly divided decedent's estate among her seven children, and named her son, Donald Opsahl, executor of the estate.

In October 1983, due to decedent's failing health, her physician recommended that decedent, who had been living alone, either move to a nursing home or reside with a family member. Marjorie Brummond, decedent's daughter, volunteered to live with and take care of decedent, so decedent moved in with Marjorie, her husband Richard, and two of the couple's three children. Marjorie was initially paid $300 per month for taking care of decedent. Marjorie's compensation increased over the years and reached $450 per month in 1987. Nursing home care would have cost $1600 per month.

In the fall of 1985, the Brummonds and decedent moved to decedent's farm in Kingston, Minnesota. The Brummonds continued to care for decedent. The services the Brummonds provided included: transporting decedent to and from medical providers; purchasing and preparing decedent's meals; and ensuring that decedent took prescribed medication.

In June 1987, decedent told Marjorie Brummond that decedent wanted to make a new will leaving the farm to Marjorie. Marjorie immediately told her brother Russell Opsahl about this development. Russell, in turn, told Donald Opsahl about decedent's intent to change her will. Donald testified that he told the rest of the children about the planned change, and claims they were very upset. Donald stated that he did not think it was fair for decedent to leave the farm to the Brummonds because Marjorie was being paid to take care of decedent.

Upon Marjorie Brummond's request, Robert Schaps, an attorney from Litchfield, went to the farm to visit decedent. The specific purpose of the visit was to discuss decedent's will. Schaps testified decedent wished to divide all her property equally, except that decedent wanted the farm to go to Marjorie Brummond. According to Schaps, decedent wanted to change her will to provide a home for Marjorie because decedent's other children had homes of their own, but Marjorie did not.

On June 10, 1987, Donald Opsahl contacted Ronald Thomton to discuss setting up a conservatorship for decedent with Donald as conservator. The next day, Romel Lembke, Donald Opsahl, Donald's wife Elaine, and Russell Opsahl, went to see decedent at the farm. According to Marjorie's testimony, the group barged in without knocking on the door and confronted decedent about her plan to change her will. Marjorie testified that Donald pounded on the dining room table and said, "The will stays as it is." Romel Lembke testified that the children were following the advice of attorney Thomton when they went to the farm to confront decedent about her decision to change the will. Both Lembke and Donald testified that decedent told them she did not want to change her will.

Donald Opsahl filed a petition for appointment as conservator of decedent's estate on June 30, 1987. Donald was represented by Ronald Thomton in this proceeding.

Decedent executed a will prepared by Robert Schaps on July 3, 1987. This will divided her other property equally among the seven children, but left the farm to Marjorie. Schaps testified that decedent was competent when she executed the July 3 will and had not been subjected to undue influence by the Brummonds. Schaps contacted Thomton on July 6, 1987, to tell him that decedent signed a new will.

Decedent retained Schaps to represent her in the conservatorship proceedings. Decedent told Schaps that she was pleased with the way Donald had managed her finances since the death of her husband and wanted Donald to continue to do so. However, decedent wanted the arrangement to continue on a voluntary basis. De-

cedent ultimately stipulated to Donald's appointment as conservator of the estate.

On October 20, 1987, Romel Lembke picked up decedent at the farm for a weekend visit. Lembke testified that decedent brought up the subject of the July 3 will and expressed some doubts about the Brummonds' ability to manage the farm. According to Lembke's testimony, decedent now wanted to sell the farm and distribute the assets equally among the children.

When Marjorie Brummond went to the Lembke home to pick up decedent on October 24, Lembke told Marjorie that their brother Alfred was coming to visit. Lembke asked whether Marjorie would mind leaving decedent for two more days. Marjorie had no objection and agreed to come back in two days.

Marjorie returned to the Lembke residence on October 26. Exactly what took place at that time is the subject of conflicting testimony. Marjorie testified that she spoke with decedent for a few minutes and decedent wanted to return to the farm. While Marjorie was talking with decedent, Romel called the sheriff's department. Marjorie testified that Romel told the sheriff Marjorie was harassing decedent. Marjorie tried to leave, but Romel stopped her. Romel and Marjorie argued loudly and the excitement caused decedent to have a seizure. When Romel went to take care of decedent, Marjorie left.

Romel testified that on October 26 Marjorie arrived to pick up decedent and became very stern with her. According to Romel, decedent wanted to stay at the Lembke residence, but Marjorie insisted that decedent return to the farm. Romel stated that Marjorie got "kind of argumentative" with decedent, causing decedent to have a seizure. Romel claimed she had to call the sheriff's department to get Marjorie out of the house.

Following the October 26 visit to the Lembke residence, Marjorie received a letter from her brother Donald. The letter informed Marjorie that decedent had decided not to return to the farm. Donald also wrote that beginning November 1, the Brummonds would have to pay rent for living on the farm.

Marjorie asked Ronald Schaps to visit decedent at the Lembke home to ensure that decedent's decision to stay with Romel was voluntary. Schaps testified that he spoke with decedent at the Lembke home for about one-half hour. Schaps asked decedent whether she wanted to stay at the Lembke residence. According to Schaps, decedent told him several times that she wanted to stay. However, decedent once told Schaps "they won't let me go back." Schaps testified decedent did not identify who "they" were.

Ronald Thomton arranged for decedent to be examined by Dr. B.E. Currier in St. Cloud on October 29. The purpose of the examination was to establish decedent's mental competency and freedom from undue influence. Donald Opsahl, his wife Elaine, and Romel Lembke accompanied decedent to Currier's office. Currier found decedent competent at the time of the examination. However, Currier also testified that, in his opinion, decedent could be influenced rather easily. Currier stated that three of decedent's family members accompanied her into the examination room. The family members repeatedly told decedent that she had been taken advantage of and used, and decedent began repeating what her children said. Dr. Currier testified that decedent appeared to be under a great deal of stress, and he had to ask the family members to leave the room. Dr. Currier said he felt decedent should have been placed in a nursing home so she would not be exposed to such stressful situations.

On November 1, 1987, Marjorie Brummond visited decedent at the Lembke home. Marjorie told decedent about the letter Donald sent telling the Brummonds to either vacate the farm or start paying rent. Marjorie testified decedent responded by stating, "Why do that, it's yours."

On November 3, 1987, Ronald Thomton visited decedent at Romel Lembke's home. Thomton had prepared a will for decedent's signature at the direction of Donald Opsahl. Thomton testified that he discussed decedent's estate with her to determine her

competency. Thomton testified that decedent knew the extent of her estate and could identify her children. Thomton further testified decedent said that she had not been pressured into changing her will. Thomton concluded that decedent had not been subjected to undue influence by the will proponents. This last will revoked the gift of the farm to Marjorie and divided decedent's estate equally among the children. Esther M. Opsahl died on December 17, 1987, and this November 3rd will forms the basis of the dispute.

## ISSUES

1. Is there sufficient evidence to support the trial court's finding that the November 3, 1987, will of Esther M. Opsahl was the product of undue influence and thus null and void?

2. Did the trial court err by refusing to permit the personal representative to use estate funds to pay attorney fees incurred in the will contest?

## ANALYSIS

### Standard of Review

"[T]he existence of undue influence is a question of fact * * *." *In re Estate of Reay*, 249 Minn. 123, 124, 81 N.W.2d 277, 279 (1957). The factual findings of a trial court sitting without a jury will not be set aside unless clearly erroneous. *In re Estate of Balafas*, 293 Minn. 94, 96, 198 N.W.2d 260, 261 (1972). A finding will be held clearly erroneous when " 'the reviewing court is left with the definite and firm conviction that a mistake has been committed.' " *Id.* (quoting *United States v. Oregon State Medical Society*, 343 U.S. 326, 339, 72 S.Ct. 690, 698, 96 L.Ed. 978 (1952)).

### I.

#### Undue Influence

▪ The supreme court has stated that to invalidate a will based on undue influence, a court must find:

> that the will of the person exercising [the influence] is substituted for the will of the testator whereby the resulting writ-

ten testament expresses the intent and purpose of that person and not that of the testator.

*Reay*, 249 Minn. at 126, 81 N.W.2d at 280 (footnote omitted). The burden of proving undue influence is on the party contesting the will. The existence of undue influence must be shown by clear and convincing evidence. *Id.*

▪ Generally, direct evidence of undue influence is not available and circumstantial evidence can be sufficient. *In re Estate of Anderson*, 379 N.W.2d 197, 200 (Minn.Ct.App.1985), *pet. for rev. denied* (Minn. Feb. 19, 1986) (citing *In re Estate of Olson*, 176 Minn. 360, 365, 223 N.W. 677, 679 (1929)). The supreme court has identified several factors to aid trial courts in determining whether undue influence has been exerted upon a testator. The factors are: the opportunity to exercise influence; active participation in the preparation of the will by the party exercising influence; a confidential relationship between the willmaker and the influencer; disinheritance of those who probably would have been remembered; singularity of the will provisions; and exercise of influence or persuasion to make the will. *In re Estate of Wilson*, 223 Minn. 409, 413, 27 N.W.2d 429, 432 (1947).

▪ The trial court found several of these factors present here. The will proponents argue that the evidence introduced at trial does not support the trial court's findings on these factors. We disagree. First, the will proponents had opportunity to influence decedent to change her will. Donald Opsahl, Romel Lembke, Russell Opsahl, and Donald's wife Elaine, descended upon decedent's farm at 6:30 a.m. on June 11, 1987, less than one week after they learned decedent intended to leave her farm to Marjorie Brummond. The group, led by Donald Opsahl, expressed displeasure with decedent's change of heart and insisted that she leave her will alone. Furthermore, the will proponents had unlimited access to decedent while she resided at Romel Lembke's home. Thus, the evidence supports the finding that the proponents had the opportunity to influence decedent.

We also find sufficient evidence to support the trial court's determination that the will proponents actively participated in the preparation of the November 3 will. The evidence introduced at trial indicates that the proponents consulted with Ronald Thomton to devise a plan to persuade decedent to change her will. The first step in this plan was the confrontation of decedent by the proponents at the farm after the proponents learned decedent intended to change her will. Next, the proponents instituted a conservatorship proceeding against decedent after she actually changed her will and left the farm to Marjorie Brummond. Then, after decedent moved to Romel Lembke's residence, Thomton arranged to have decedent visit Dr. Currier's office in St. Cloud. The purpose of the visit was to establish decedent's competency to make a will and freedom from undue influence. This plan backfired. Dr. Currier's deposition testimony reveals that he found decedent susceptible to the influence of others. Currier's testimony indicates that decedent appeared to be under the influence of Donald Opsahl, Elaine Opsahl, and Romel Lembke.

Further evidence of the proponents' active participation is that the will was prepared by Thomton pursuant to instructions from Donald Opsahl, not decedent. Thomton did not consult with decedent before preparing the will. Additionally, Thomton's testimony, upon which proponents rely to support their argument that decedent was free from influence, was disbelieved by the trial court. The trial court found Thomton's credibility undermined by his representation of Donald Opsahl in the conservatorship proceeding against decedent. The trial court was entitled to disregard Thomton's testimony based on its assessment of his credibility. *See Tews v. George A. Hormel & Co.,* 430 N.W.2d 178, 180 (Minn.1988) (assessing witness credibility is factfinder's function).

Based on our review of the record, we conclude the trial court's finding that the proponents actively participated in the preparation of decedent's will is properly supported by the evidence. *See In re Estate of Larson,* 394 N.W.2d 617, 619 (Minn. Ct.App.1986), *pet. for rev. denied* (Minn. Dec. 12, 1986) (active participation finding upheld where proponent suggested change, destroyed earlier will, arranged for meetings with doctor and lawyer, but did not dictate terms of will to attorney).

The proponents next claim the evidence does not support the trial court's finding that a confidential relationship existed between decedent and the proponents. We reject this claim. The evidence indicates that the principal actor on behalf of the proponents, Donald Opsahl, managed decedent's finances for a number of years prior to her death. Decedent trusted Donald and relied on him for his management skills. The trial court found this evidence sufficient to establish a confidential relationship between Donald and decedent.

The proponents argue that evidence of intimacy and affection between blood relatives negates an inference of undue influence. *In re Estate of Marsden,* 217 Minn. 1, 11–12, 13 N.W.2d 765, 771 (1944). This statement, as a general proposition, is correct, but no evidence in the record establishes the existence of intimacy or affection between Donald and decedent. Instead, the evidence demonstrates that the relationship was one of dependence. Decedent depended upon Donald for his financial management skills. *Cf. Anderson,* 379 N.W.2d at 201 (evidence supported finding of intimacy and affection between decedent and daughter accused of undue influence based on daughter's frequent visits and decedent's reference to daughter as "number one child"). We conclude the trial court properly found a confidential relationship between decedent and Donald Opsahl.

The proponents also assert that the distribution scheme of the November 3 will is evidence of the absence of undue influence. We reject this assertion. Decedent's July will left her farm to Marjorie Brummond and distributed the remaining property equally among all the heirs. The November will revoked the gift of the farm to Marjorie and provided that decedent's estate, including the farm, would be divided equally among all the heirs. This change

favored the proponents of the will and provides circumstantial evidence of undue influence. *See In re Estate of Olson*, 227 Minn. 289, 298, 35 N.W.2d 439, 446 (1948) (where a change in a will benefits a party charged with exercising undue influence, the change "is a strong circumstance to support a charge of undue influence.").

The proponents' final claim is that the record contains "no evidence that undue influence was actually exercised." The proponents argue that the testimony of Ronald Thomton, Robert Schaps, and Dr. Currier establishes the absence of undue influence. The trial court found Thomton's testimony lacking in credibility due to his representation of Donald Opsahl in the conservatorship proceeding. The court also found Dr. Currier's testimony evidence of decedent's susceptibility to, rather than freedom from, undue influence. Furthermore, Schaps testified that when he met with the decedent on October 28, she appeared physically weak, confused, and sad. Decedent told Schaps that she was being held at the Lembke residence against her will. Finally, we note that just two days before decedent executed the will that revoked the bequest of the farm to Marjorie Brummond, decedent reaffirmed her intention to leave the farm to Marjorie.

The trial court found that undue influence was actually exercised in this case, and that the November 3 will was the product of this undue influence. In reaching this conclusion, the court took into account decedent's physical and mental condition, the circumstances leading up to the execution of the November 3 will, and the decedent's relationship with the proponents. The court also relied on Dr. Currier's testimony which revealed decedent's susceptibility to influence.

We hold that the trial court's finding of undue influence is supported by "sufficient circumstantial evidence." *In re Estate of Olson*, 176 Minn. 360, 365, 223 N.W. 677, 679 (1929). Many of the trial court's findings were based on credibility assessments which we refuse to disturb. *See Tews*, 430 N.W.2d at 180. Our review of the record does not leave us with "the definite and firm conviction that a mistake has been committed." *Balafas*, 293 Minn. at 96, 198 N.W.2d at 261. We affirm the trial court's ruling.

## II.

### Attorney Fees

■ In a post-trial motion, Donald Opsahl, as personal representative of the estate, requested authorization from the trial court to use estate funds to pay attorney fees incurred in the will contest. The basis for the request was Minn.Stat. § 525.515 (1988) which provides in relevant part:

(a) Notwithstanding any law to the contrary, an attorney performing services for the estate at the instance of the personal representative, guardian or conservator shall have such compensation therefor out of the estate as shall be just and reasonable. This section shall apply to all probate proceedings.

The trial court found "the only truly consistent interest the firm represented was the interest of the final will proponents." The court noted that the firm representing Donald Opsahl in the will contest also represented him in the conservatorship proceedings he instituted against the decedent. Thomton, a member of the firm, also advised Opsahl in his efforts to have decedent change her July 3 will. The court concluded the services provided by the law firm in the will contest did not benefit the estate, and therefore refused to authorize the use of estate funds for payment of the fees.

We find no error in the trial court's ruling. *In re Estate of Balafas*, 302 Minn. 512, 516, 225 N.W.2d 539, 542 (1975) (attorney fee awards in probate proceedings will not be reversed absent abuse of discretion). In *Balafas*, the supreme court affirmed a trial court's refusal to authorize use of estate funds to pay attorney fees attributable to time spent trying to probate a will ultimately held invalid due to undue influence. Despite the mandatory language of the statute, the supreme court concluded that the trial court properly considered whether the services for which the fees

were sought actually benefited the estate and whether those services were chargeable to the undue influence. *Id.* at 515–16, 225 N.W.2d at 541.

We conclude the trial court properly refused to allow the use of estate funds to pay attorney fees incurred in this will contest. Based on *Balafas*, the trial court appropriately considered whether the services for which the fees were sought actually benefited the estate. The trial court's conclusion that those services did not benefit the estate, but only the proponents of the will, has full support in the record. Accordingly, we affirm the trial court's ruling.

### DECISION

The trial court's finding of undue influence is supported by the record. The trial court did not err by refusing to permit estate funds to be used to pay attorney fees incurred in the will contest.

Affirmed.