[1] Reported in 18 N.W.2d 781.
On May 20, 1941, the will of P.T. Meehan, who died on May 5, 1941, was presented for allowance to the probate court of Steele county by Rose Meehan, widow of decedent, the executrix named in the will, and one of the principal beneficiaries thereunder. Objections *Page 3 
thereto were filed by Rose Mary Ryan, granddaughter of decedent by a deceased daughter of his first marriage, on the grounds that decedent did not have mental capacity and that undue influence affected the execution of the will. The probate court, after a full hearing, admitted the will to probate.
On appeal to the district court, at the close of the testimony the following questions were submitted to the jury: (1) Did testator at the time of the execution of the will have mental capacity? (2) Was undue influence used which affected the execution of the will? Both questions were answered in the affirmative. On May 9, 1944, the trial court made its order granting judgment in favor of proponent notwithstanding the jury's verdict and admitted the will to probate. From such order this appeal is taken. The jury's verdict that decedent had mental capacity is not challenged.
Patrick T. Meehan, the decedent, resided at Blooming Prairie for more than 50 years prior to his death. On April 29, 1941, shortly after his 85th birthday, he suffered an attack of coronary thrombosis, from which he died on May 5, 1941. During the six days of his illness he was confined to his bed. On May 1, 1941, the will in question was executed. By the terms thereof, he bequeathed to his wife, Rose Meehan, to whom he had been married for 22 years prior to his death, all of his property for the term of her natural life, "with the right and privilege of using such part of the corpus of the estate that she deems necessary to maintain her station in life." Upon her death, the will devised to Dorothy Colbert, a daughter of his widow (but not the child of decedent), an undivided one-third, and to Harold, Charles, and Howard Meehan, sons of decedent by his first marriage, an undivided two-thirds of the residue of such estate.
The will provided: "I have purposely refrained from devising or bequeathing any of my property to my daughter, Ethel, and my daughter, Mabel." His daughter Ethel had been dead for some 20 years and had left surviving her four children, one of whom is the contestant. The evidence disclosed that some time prior to his death decedent had caused certain real estate he then owned to *Page 4 
be sold and the proceeds thereof divided between the said daughters. Presumably for this reason they and their issue were excluded from the will, although it further appears that the four children of Ethel, including contestant, had not been on friendly terms with decedent at the time of his death, and in fact for five years prior thereto had not spoken to him upon meeting him.
Glenn S. Thorson, a reputable attorney of Blooming Prairie, prepared the will and saw to its execution by decedent. He was called to the home of decedent by proponent's daughter for this purpose on May 1, 1941. At that time, he and decedent were alone for about three-quarters of an hour. Decedent then gave him instructions in connection with the preparation of the will. Thorson then left the home of decedent and returned to his office, where the will was typed in accordance with decedent's instructions. Thorson returned later the same day to the home of decedent. In the presence of Dr. H.T. Kurtin, decedent's physician, and proponent, he twice read the will to decedent. Subsequently the will was executed by decedent in accordance with the statutes, Mr. Thorson and Dr. Kurtin signing as witnesses thereto.
The estate is not large. At the most, its gross value will not exceed $7,200, and when the funeral expenses, an unpaid mortgage in the sum of $1,000, and the expenses of administration are deducted therefrom, it is doubtful if it will exceed $5,000. If the will were disallowed and the widow took under the statutes, contestant's share would amount to less than $300 at the most. It is obvious that the strained and unfriendly relationship existing between the children and grandchildren of decedent by his first marriage and the proponent here is the primary factor motivating this contest.
The only question involved is whether there is sufficient evidence to sustain the jury's finding of undue influence. Contestant urges that the following factors and circumstances are sufficient to sustain such a finding, to wit: (1) The unusual, unnatural, and "vicious" disposition of decedent's estate by the terms of the will; (2) the fact that proponent had an opportunity to exercise undue influence; (3) the fact that the children and grandchildren of decedent, *Page 5 
including contestant, were not promptly notified of his illness or of the making of his will; (4) the circumstances surrounding the calling of Mr. Thorson and the preparation and execution of the will under his direction; (5) the fact that the original will indicated the possibility that the name "Sarah" had been erased and the name "Ethel" substituted therefor in the exclusion clause; (6) the failure of Mr. Thorson's stenographer to retain her shorthand notes on the will and the failure of proponent's daughter, a trained nurse, to preserve the sickroom records of decedent's temperature, etc.; (7) the age and physical condition of decedent and the administration of morphine to him during his last illness to induce sleep, thereby weakening his mental capacity.
1. At the outset it may be stated that we do not regard the provisions of the will as unusual, unnatural, or vicious, as contended by contestant. Rather, it appears to be a logical and natural disposition of his property by decedent and an attempt to provide as adequately as possible, from his small estate, for his widow, who for 22 years had rendered him the care and comforts required by a man of his age. At the time of his death she was 55 years of age. It would not have been unusual or unnatural for him to have left her outright his entire estate in view of the small amount involved, her age, and the many years during which she had cared for him. It would appear further that, had proponent been intent upon exercising undue influence and had decedent been subject thereto as contended, it would have been more logical for her to induce him thus to leave her the entire estate. It may be noted likewise at this point that proponent's daughter had lived in decedent's home and had aided in caring for him for many years. Under these circumstances, the conclusion cannot be escaped that the will here under attack is not unusual, unnatural, or vicious as is contended, but rather appears to be a logical, natural, and just disposition of his property by decedent to those closest to him for whom he had not previously provided.
2. It is true, the opportunity for undue influence existed. It may also be stated that likewise there was present for proponent *Page 6 
the opportunity to exert due and just influence upon decedent during the 22 years in which she lived with and cared for him. It may be added that, insofar as contestant is concerned, the opportunity for influence of any kind, due or otherwise, was absent, for she had not been to decedent's home nor spoken to him for five years prior to his death. But there is no evidence in the record to indicate that proponent at any time exercised undue influence upon decedent in connection with either the instructions given to his attorney or in the preparation and execution of the will. Opportunity alone is not sufficient to sustain a verdict of undue influence, particularly where the provisions of the will are not unusual or out of line with what may be regarded as a natural disposition of the property of a decedent. See, In re Estate of Mazanec, 204 Minn. 406,283 N.W. 745; In re Estate of Marsden, 217 Minn. 1,13 N.W.2d 765.
3. The fact that his children and grandchildren were not notified that decedent had suffered a stroke or that a will had been executed does not in itself support a finding of undue influence. It is true that where other facts and circumstances strongly point to undue influence and where the will appears to be unnatural and unjust, such a factor may be worthy of consideration by a jury; but, standing alone, or with other evidence equally remote and speculative, it is not sufficient to sustain a verdict of undue influence. Here, it may be argued that, had decedent desired to advise his children that he had executed his will, certainly he had every opportunity to do so. The jury found that he had mental capacity during this period, and it is undisputed that three of his children visited with him and were in the room with him for substantial periods of time prior to his death. Had decedent wished to inform them that he had executed his will, he had every opportunity to do so. Since he knew such information might lead to conflict with them, or between them and proponent, he may have refrained from advising them of such facts. He was conscious that there existed a strained relationship between them and his wife. There is no evidence that she endeavored to keep him *Page 7 
and his children apart or attempted to estrange them from him. The very fact that he made disposition in their favor in the will would indicate that they had not been estranged from him. These facts and circumstances adequately distinguish the case from In re Estate of Mollan, 181 Minn. 217, 232 N.W. 1, relied upon by contestant, where the court found that the widow had actually succeeded in estranging her husband from his children by a prior marriage and where as a result thereof they were entirely excluded under the terms of his will.
4. The record discloses that the attorney, Mr. Thorson, was advised by decedent to prepare the latter's last will and testament in private, without the presence of proponent or anyone else, and that decedent gave him full instructions as to the beneficiaries. There was nothing unusual or unethical insofar as Mr. Thorson's participation in this matter is concerned. He had once before acted as attorney for decedent. He had never acted as attorney for proponent, and in fact he had had no prior conversation or business or professional dealings with her. If we were to believe the claims of contestant here that the will was obtained by undue influence, we should be obligated to conclude that the attorney, Mr. Thorson, participated therein. There is nothing in the record to justify such a belief or conclusion, nor does there appear any motive which would impel him so to act. On such flimsy evidence and contentions, we are at a loss to ascertain why such charges are leveled at him. It is true, we have held that an attorney who expects to be called upon as a witness should refrain from appearing as counsel in the litigation, and we again stress our admonition to attorneys in this respect. While Mr. Thorson did act in conflict with this rule, nevertheless a careful reading of his testimony and the entire record is convincing that, aside from this, he acted at all times in accordance with the duties and obligations imposed upon him as a member of the bar in carrying out the instructions of his client in the preparation of the will, in obtaining its execution, and subsequently in supporting it in probate and district courts. *Page 8 
5. It has been suggested that the original will indicates that the name "Sarah" (the name of decedent's first wife) was erased and the name "Ethel" substituted therefor in the exclusion clause above referred to. It is to be noted that, had decedent mentioned his wife Sarah, as contestant contends he intended, rather than his daughter Ethel, in this exclusion clause, it is obvious that his mental capacity then would have been seriously subject to question. If the name "Sarah" was inadvertently first inserted at this point and subsequently erased and the name "Ethel" substituted therefor, it is difficult to see how this factor can be urged as indicating undue influence on the part of proponent. Just what she would lose or gain by such an alteration is not capable of ascertainment. Nor does the fact that Ethel had been dead for 20 years appear of significance in this connection. It seems clear that decedent in directing the insertion of her name intended thereby to eliminate the possibility of her children's inheriting under his will, not only because they were not friendly to him, but because he had previously provided for his daughters in an amount at least equal to that of his other children. Certainly, there is completely absent from the record any evidence which would indicate that the proponent had any connection with such erasure. In consequence, we are compelled to conclude that in these facts and circumstances there is nothing which can be urged as sustaining the jury's finding that proponent was guilty of exercising undue influence.
6. The failure of Mr. Thorson's stenographer to retain her stenographic notes would seem to have no bearing on the issue of undue influence on the part of proponent. The record indicates that the stenographer shortly thereafter terminated her employment with Mr. Thorson, which may account for the disappearance of the notes. In any event, to hold that the failure to produce them was chargeable to proponent and indicated the exercise of undue influence on her part, when the record establishes she was not present when the instructions were given to Mr. Thorson or when the will was typed in his office, would be to accept speculation *Page 9 
and conjecture rather than evidence to sustain the trial court's determination.
Likewise, the failure to retain sickroom records of decedent's temperature cannot be urged as sustaining a verdict of undue influence. There is no doubt that at the time of the making of the will decedent was ill and had high temperatures and other symptoms which accompany an affliction of this kind. It is likewise true that he was extremely aged and in a weakened physical condition and that it was necessary to administer morphine and other drugs to ease his pain. However, the jury specifically determined that during this period he retained his mental capacity to execute a will, and indeed the terms, conditions, and provisions of the will seem clearly to establish that he was possessed of his faculties until shortly before his death and for some time subsequent to the execution of the will. Under such circumstances, since these factors go toward the question of mental capacity rather than undue influence, and since, further, there is no connection between them and proponent here, we do not feel that they, alone or in conjunction with the other remote matters we have discussed, would be sufficient to sustain a verdict of undue influence.
7. There are many other facts and circumstances urged by contestant here as indicating that the jury's finding of undue influence is sustained by sufficient evidence. However, such facts and circumstances are present in most cases where wills are prepared and executed, and in no respect could they, in themselves, be held to indicate undue influence. Such, for example, is the fact that Dr. Kurtin, decedent's physician, appeared as one of the witnesses to the will. Such, for example, is the fact that when decedent was first taken ill, proponent kept friends from visiting him because of the condition of his health. Such, for example, is the fact that decedent did not read the will but had it read to him in detail by his attorney. Such, for example, is the fact that decedent had not prior to this time ever made a will. Such, for example, is the fact that decedent did not inform members of his family of the making of the will. Where the will is unjust and *Page 10 
unnatural, we do not state that such factors may not be of importance; but here the fundamental factor which makes them of importance in will contests is utterly missing, for the will was not unnatural or unjust and did not exclude from its terms and provisions those who might naturally expect to be the objects of decedent's bounty. On the contrary, the will appears in all respects to provide for those who were entitled to his concern and care.
Affirmed.