**In the Matter of ESTATE OF Jessie Pearl OLSEN, a.k.a. Jessie P. Olsen, Sandra Olsen Clark, et al., Objectors.**

**No. CO–84–556.**

Court of Appeals of Minnesota.

Nov. 13, 1984.

Thomas Bennett Wilson, III, Gayle Gaumer, Edina, for appellants.

Eric J. Magnuson, Mary W. Mason, Rider, Bennett, Egan & Arundel, Minneapolis, for respondent.

Heard, considered and decided by POPOVICH, C.J., and LESLIE and CRIPPEN, JJ.

## OPINION

LESLIE, Judge.

Appellants objected to admission of decedent Olsen's will into probate alleging she lacked testamentary capacity, that she had been unduly influenced and that provisions benefiting respondent were void. After a trial the court rejected appellants' objections to Olsen's will and admitted it to probate. Appellants moved for amended findings, conclusions and order, or for a new trial. The trial court denied the motions and this appeal followed. We affirm.

## FACTS

Decedent Jessie Olsen died at the age of 90 years on January 23, 1982. Her husband predeceased her in 1971 and her only child William died in 1979. William's two daughters and his grandson Kasey are Olsen's surviving heirs at law and the appellants herein. Olsen is also survived by her niece Audrey Reyerson and Audrey's daughter Kathryn who are the proponents of the will.

During the last decade of Olsen's life she suffered from various infirmities including neurological problems. In 1973 she was hospitalized for temporary memory loss but released after her memory returned. In early 1974 she was hospitalized following an episode of confusion. At that time her physician diagnosed high blood pressure and, at one point, acute hypertension. Olsen was released from the hospital and returned home where she lived alone attended by her housekeeper.

As Olsen's health slowly deteriorated, so did her relations with her son William and his family. In late 1975 or early 1976, after Olsen had a minor car accident, William suggested that she sell her car and stop driving. William's suggestion offended Olsen. During the same period William withdrew several thousand dollars from a joint account he held with Olsen. When Olsen learned of the withdrawal, she believed that William had taken her money as a part of a plot to force her to sell her home which she held in joint tenancy with him. She sued William for the amount withdrawn. Sometime later the suit was dismissed with prejudice by Olsen's attorney. The money proved to be William's money.

Following initiation of the lawsuit, family relations deteriorated. Visits between William's family and Olsen became infrequent and strained. Olsen, however, did not comprehend that the lawsuit caused familial stress, perhaps because she was sometimes confused. During a deposition taken during 1976 she indicated that she did not believe she was suing William.

Although the extent of disharmony is disputed by the parties, relations reached a low at William's death in May 1979. Olsen was brought to William's home the afternoon after he died but William's wife

turned her away and apparently accused Olsen of causing his death through the anxiety she had created for him. After that Olsen saw her granddaughters and her newly born great-grandson infrequently. Olsen adored the young boy.

Olsen's health problems continued. In 1978 she was hospitalized for chest pain and confusion. The physician diagnosed the ailment as pneumonia. Later in 1978 her housekeeper brought her to the emergency room when her speech became garbled. The physician stated the problem was related to hypertension. On each of these occasions the problems subsided after a short time and she returned home. In 1979 Olsen telephoned her doctor complaining of speech difficulty. That problem disappeared without treatment.

All through this time Olsen grew closer to her niece, respondent Audrey Reyerson. Audrey Reyerson spent considerable time with her and Olsen relied upon her. After William died Olsen began speaking about changing her 1978 will which left her entire estate to appellants, William's two daughters. The largest part of her estate is her home which she purchased with William's assistance and held with him in joint tenancy. Olsen wanted to change her will to give most of her estate to Audrey Reyerson. She also indicated her intent to Audrey Reyerson's husband Paul.

In January 1980 Audrey Reyerson went to her husband with instructions for the drafting of Olsen's new will. Paul Reyerson, an attorney and former chairman of a Minneapolis bank's trust department, drafted the will and gave it to Audrey who brought it to Olsen. Olsen signed the will in the presence of three witnesses. All three witnesses testified that Olsen appeared to have a clear mind when she signed the will. The will gave her entire estate to Audrey Reyerson with the exception of $1,000.00 which she left to her two-year-old great-grandson. It named Audrey and Paul Reyersons' daughter Kathryn contingent beneficiary.

In June 1980 Olsen's speech problem reappeared. A computerized axial tomogra-phy (CAT) scan taken at that time showed brain atrophy. A physician diagnosed Olsen's speech problems as the beginning of organic brain syndrome. She again returned home where she lived with assistance. In November 1981 Olsen suffered a stroke. After hospitalization she was placed in a nursing home where she died in January 1982.

In January 1983 respondent Audrey Reyerson, as personal representative, filed a petition for formal probate of Olsen's will. In February 1983 appellants filed an objection to the petition which their attorney later withdrew by stipulation. The probate court admitted the will to probate in April 1983. In July 1983 appellants moved, through a different attorney, to vacate the order admitting the will. To discover the basis for the objection respondents scheduled a deposition of appellants' former attorney. Appellants objected to the deposition and respondents obtained an order compelling the deposition but limiting its scope, and awarded attorney's fees. The trial court later granted appellants' motion and vacated its earlier order admitting the will.

## ISSUES

1. Is the trial court's conclusion that decedent had testamentary capacity when she executed her will clearly erroneous?

2. Is the trial court's conclusion that the testatrix's will was not the product of undue influence clearly erroneous?

3. Is a lawyer's spouse prevented from benefiting under a will he drafted for the testatrix?

4. Did the trial court err by refusing to grant a new trial when the trial court excluded expert testimony on testatrix's brain atrophy?

5. Did the special term court err by granting attorney's fees to respondent for the cost of bringing a discovery motion?

6. Is respondent entitled to attorney's fees for the appellant's allegedly bad faith will contest?

## ANALYSIS

■ The contestants of a will have the burden of proving lack of testamentary capacity and undue influence. Minn.Stat. § 524.3–407 (1982); *In re Estate of Congdon*, 309 N.W.2d 261, 266, n. 8 (1981). On appeal from a probate court's decision, after a trial without a jury, its findings of fact will be disturbed only if clearly erroneous. Minn.R.Civ.P. 52.01; *In re Estate of Balafas*, 293 Minn. 94, 96, 198 N.W.2d 260, 261 (1972).

### I. Lack of Testamentary Capacity

■ To execute a valid will a testator must have testamentary capacity at the time of execution.

[A] testator will be found to have testamentary capacity if when making the will the testator understands "the nature, situation, and extent of his property and the claims of others on his bounty or his remembrance, and he [is] able to hold these things in his mind long enough to form a rational judgment concerning them." *In re Estate of Healy*, 243 Minn. 383, 386, 68 N.W.2d 401, 403 (1955).

*In re Estate of Congdon*, 309 N.W.2d at 266.

This case resembles *In re Estate of Congdon* for persuasive evidence indicates both mental capacity and incapacity. In *Congdon* the contestants showed the testatrix suffered from aphasia and memory loss. She was also the subject of a conservatorship and her attorney had used a lack-of-capacity defense to contract claims against her. Other evidence nonetheless showed she generally understood conversations and would have been capable of understanding the will if care had been taken to explain it to her. The supreme court found that evidence sufficient to support the trial court's finding that the testator had capacity to execute a will. *See also In re Estate of Forsythe*, 221 Minn. 303, 307, 22 N.W.2d 19, 22–23 (1946).

■ While appellants presented considerable evidence that Olsen's mind was infirm, other evidence presented by the respondent suggested Olsen's mental lapses had subsided leaving her relatively lucid. Although the evidence is conflicting substantial evidence supports the trial court's decision that Olsen had testamentary capacity when she executed the 1980 will.

### II. Undue Influence

■ Undue influence is a subjective concept which is difficult to define. One writer stated the rule as follows:

A will is invalid if it is obtained through an influence which destroys the free agency of the testator and substitutes another's volition for his. Influence may be undue although it does not amount to physical coercion, but mere advice, persuasion or kindness does not constitute undue influence.

T. Atkinson, *Handbook of the Law of Wills* § 55, at 255 (2d ed. 1953). The Minnesota Supreme Court stated the standard for showing undue influence:

The evidence must go beyond suspicion and conjecture and show, not only that the influence was in fact exerted, but that it was so dominant and controlling of the testator's mind that, in making the will, he ceased to act of his own free volition and became a mere puppet of the wielder of that influence.

*In re Estate of Reay*, 249 Minn. 123, 126–27, 81 N.W.2d 277, 280 (1957).

■ The burden of proving undue influence lies upon the contestant. Minn.Stat. § 524.3–407. Undue influence normally must be shown through circumstantial evidence.

Among the factors important as bearing upon the fact of undue influence are the opportunity to exercise it, active participation in the preparation of the will by the party exercising it, a confidential relationship between the person making the will and the party exercising the influence, disinheritance of those whom the decedent probably would have remembered in his will, singularity of the provisions of the will, and the exercise of influence or persuasion to induce him to make the will in question.

*In re Estate of Wilson,* 223 Minn. 409, 413, 27 N.W.2d 429, 432 (1947). *See also In re Estate of Olson,* 227 Minn. 289, 297, 35 N.W.2d 439, 445 (1948); *In re Estate of Prigge,* 352 N.W.2d 443, 445–46 (Minn.Ct. App.1984).

■ The trial court in its memorandum stated that the contestants made a prima facie case for undue influence. Indeed, Audrey Reyerson's role as courier between her aged aunt and her lawyer husband taints the will with impropriety. The court, however, chose to find that the will was not the product of undue influence because other evidence implied that her act was volitional. Such evidence includes Olsen's statements to disinterested parties consistent with the will, the strained relations between Olsen and her son William's family and the close relation between Olsen and Audrey Reyerson. Evidence also showed Olsen retained a rather stubborn and strong-willed attitude about many matters through the time of the will. Since substantial evidence supports the trial court's findings the trial court must be affirmed.

### III. The Scrivener's Relationship to Beneficiaries

Under Roman law a will drafted by a beneficiary was void. T. Atkinson, § 55, at 261. American law has neither been as strict nor as settled. In *In re Estate of Simmons,* 156 Minn. 144, 149, 194 N.W. 330, 332 (1923), the Minnesota Supreme Court described the law:

> Where the beneficiary sustains confidential relations and drafts the will, or controls its drafting, it is variously stated, the phraseology and perhaps the precise thought changing from case to case, with some attendant confusion of expression and meaning, that a presumption of undue influence arises, or that an inference to that effect may be drawn as a fact, or that the facts stated make a prima facie case, or that the case is one for scrutiny.

■ Minnesota has not established a rule on this issue although the Minnesota Code of Professional Responsibility EC 5–5 discourages attorneys from drafting wills under which they may benefit.

A lawyer should not suggest to his client that a gift be made to himself or for his benefit. If a lawyer accepts a gift from his client, he is peculiarly susceptible to the charge that he unduly influenced or overreached the client. If a client voluntarily offers to make a gift to his lawyer, the lawyer may accept the gift, but before doing so, he should urge that his client secure disinterested advice from an independent, competent person who is cognizant of all the circumstances. Other than in exceptional circumstances, a lawyer should insist that an instrument in which his client desires to name him beneficially be prepared by another lawyer selected by the client.

*See also* Minnesota Code of Professional Responsibility EC, 5–2, EC 7–9, EC 9–2.

Appellants argue these ethical concerns and the principles behind them give rise to a rule preventing a lawyer from benefiting under a will he drafts even though undue influence is not otherwise shown. That rule, appellants claim, extends to gifts benefiting a lawyer's immediate family.

The canons of professional responsibility and sound reason compel attorneys to refrain from drafting wills they may benefit under. In addition to suggesting undue influence, the attorney creates a conflict of interest between himself and the testator. These appearances of impropriety invite litigation which is costly to the estate and endangers bequests and devises under the will.

We see no basis to distinguish gifts to a scrivener from gifts to his immediate family for both directly or indirectly benefit the scrivener and imply undue influence. We decline, however, to apply a per se rule invalidating such gifts nor do we find Paul Reyerson's conduct unduly influenced Olsen. We affirm the trial court only because substantial evidence showed Olsen intended the provisions in her 1980 will.

### IV. Exclusion of Expert Testimony

■ Appellants complain that the trial court erred when it refused to allow a

neurologist to interpret CAT scans taken in 1974 and 1980. The testimony was offered to show the extent of Olsen's brain atrophy. Respondent objected for lack of adequate notice. Later, during the trial, appellants moved the court to appoint an expert to interpret the CAT scans but the court refused that request. Appellants argue they did not know the expert testimony was needed until a week before trial and they immediately gave notice to respondent. Appellants demand a new trial in the interests of justice.

In this case, however, the expert testimony was excluded because no timely notice was given to respondent. While its exclusion may have prejudiced appellants' case, the absence of notice presents practical problems which are best left within the trial court's discretion. *See Phelps v. Blomberg Roseville Clinic*, 253 N.W.2d 390 (Minn.1977). Further, prejudice to appellants is difficult to assess without an offer of proof which appellants failed to make.

### V. Attorney's Fees for Discovery Motion

 Appellants argue that the trial court erred by granting respondent's attorney's fees for her motion to compel the deposition of appellants' former attorney. On the morning of the deposition, appellants objected to the deposition on the basis of the attorney-client privilege. Respondent obtained an order compelling the deposition but limiting its scope. The special term court awarded respondent attorney's fees. Appellants argue that they prevailed to some extent and therefore the award was improper.

Respondent claims the award is not appealable because it is not on the merits or a final order. *Brown v. Saint Paul City Railway*, 241 Minn. 15, 30, 62 N.W.2d 688, 699 (1954) contradicts that argument and says that discovery orders are reviewable upon appeal from a final judgment.

If a party's motion is granted in part but denied in part, the court may apportion costs as it deems just, including reasonable attorney's fees. Minn.R.Civ.P. 37.01(4). Although it is difficult to discern who prevailed on the motion given the parties' conflicting versions of their dispute, it is clear respondent prevailed to some extent. Even if both parties prevailed, as contestants claim, the award was proper.

### VI. Bad Faith Attorney's Fees

 Respondent claims she is entitled to attorney's fees, alleging appellants contest of the will is frivolous and commenced in bad faith. We disagree.

### DECISION

The trial court's findings that the testatrix had testamentary capacity and was not unduly influenced are not clearly erroneous. Although respondent's husband was scrivener of the will, she may still benefit under the will. Appellants failed to show a new trial is warranted. The trial court properly awarded attorney's fees for respondent's discovery motion. Respondent's request for attorney's fees related to this action is denied.

Affirmed.