In the Matter of the ESTATE OF Gerald Charles ANDERSON, a.k.a. Gerald C. Anderson, Deceased.

No. C5-85-871.

Court of Appeals of Minnesota.

Dec. 24, 1985.

Review Denied Feb. 19, 1986.

Richard A. Beens, Anoka, for appellant Mary Ann Reynolds.

Rolf T. Nelson, Robbinsdale, for respondents Sally Ann Sellers, Carol Ann Young, Robert Charles Anderson and Carl Earl Anderson.

Heard, considered and decided by HUSPENI, P.J., and FOLEY and FORSBERG, JJ.

## OPINION

HUSPENI, Judge.

Mary Ann Reynolds, appellant and daughter of decedent Gerald Anderson, attempted to admit into probate a second codicil to decedent's will. Respondents, who were decedent's four other children, objected to the probate of this second codicil. An advisory jury found that the second codicil was executed as a result of undue influence exerted by Reynolds. The trial court adopted the advisory jury's finding of undue influence. Reynolds appeals from the order denying probate of the second codicil and the trial court's denial of her motion for amended findings or a new trial. We reverse.

## FACTS

In 1981, decedent executed a will leaving his entire estate to his five children in equal shares. Later that same year, decedent executed a codicil to his will which merely changed the designated personal representative.

On April 17, 1984, decedent was found intoxicated and walking about the neighborhood near his home in Osseo, Minnesota. The police took him home and, at his direction, telephoned Reynolds in Oklahoma City. Reynolds told the police to

take her father to the hospital. She left later that same evening by car for Minneapolis. Decedent was taken immediately to the Veterans Administration Hospital in Minneapolis.

Reynolds left Oklahoma City without informing any of her brothers or sisters of their father's condition. All respondents also resided in Oklahoma City. Upon arriving in Minneapolis on April 18, Reynolds went to visit her father at the hospital and there learned that he was terminally ill. She then proceeded to take charge of her father's affairs.

On April 19, Reynolds contacted Medard Kaisershot, decedent's attorney who drafted decedent's will and first codicil, and told him that her father wished to deed his house to her. Kaisershot met with decedent that same day in the hospital. Early the next morning Reynolds telephoned Kaisershot and told him that her father would not recover from his illness. Kaisershot returned that afternoon with the second codicil to decedent's will which was executed there in the hospital. Reynolds was not present during either of these two meetings between decedent and his attorney.

The second codicil provided that Reynolds alone receive the homestead. It did not otherwise change the will which provided that all five children share equally in the remainder of decedent's estate. Apart from the homestead, the estate consisted primarily of decedent's coin and currency collections. Decedent valued these collections at around $100,000, although it appears they were in fact worth much less at the time of his death.

On April 23, three days after the codicil was executed, Reynolds arranged for another attorney to prepare a general power of attorney. This power of attorney, executed that same day, gave Reynolds control over decedent's safety deposit boxes which contained his coin and currency collections. Soon thereafter, decedent signed a signature card naming Reynolds the joint owner of his checking account. At no time did she inform her brothers and sisters that

she was in Minneapolis, that their father was dying or that she was taking charge of their father's affairs.

Hospital records indicate that decedent was alert and oriented from the time of his admission on April 17 until execution of the codicil on April 20. Kaisershot testified that decedent recognized him immediately when he entered his hospital room on April 19. Decedent appeared to be alert throughout Kaisershot's explanation of the tax advantages of conveying the house by will rather than by a quit claim deed. When Kaisershot asked decedent whether he wanted Reynolds alone to have the entire homestead, decedent responded "yes" without hesitation. When Kaisershot returned to the hospital on April 20, decedent again confirmed that he intended Reynolds alone to get the house. Decedent then signed the codicil although he probably could not read it due to his poor eyesight. Decedent's physical condition progressively worsened and he remained in the hospital until he died on May 14, 1984.

In his prime, decedent was a strong-willed man with numerous avocations. Although his physical activity was restricted in his final years, he continued to evidence his strength of will. Barely three months before his death, he angrily confronted his son who, while visiting decedent, had stayed out too long without first informing his father. Even during his last days in the hospital, he would refuse to take his medicine if he did not like the taste.

During the last five years of his life, decedent saw Reynolds more often than his other children. She visited decedent in Minnesota once a year, whereas only one of her siblings visited him in the last five years and that visit was incidental to a funeral one of her brothers was attending. During his last two visits to Oklahoma, decedent stayed at Reynolds' house.

Unlike her brothers and sisters, Reynolds did not criticize or exclude her father for his sometimes crude and inappropriate manner of speaking. She would purchase alcohol for him if he requested and, although she did tell him he should quit

drinking, she did not insist that he seek alcohol treatment as did her brothers and sisters. In addition, an acquaintance of decedent testified that decedent had referred to Reynolds as his "number one child."

## ISSUE

Did the trial court err in finding that decedent's second codicil was executed as a result of undue influence by appellant?

## ANALYSIS

This court will not set aside a trial court's findings unless they are clearly erroneous. Minn.R.Civ.P. 52.01. A trial court's finding will be deemed clearly erroneous only if "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *In re Estate of Balafas*, 293 Minn. 94, 96, 198 N.W.2d 260, 261 (1972) (quoting *United States v. Oregon State Medical Society*, 343 U.S. 326, 339, 72 S.Ct. 690, 698, 96 L.Ed. 978 (1952)).

■ Under Minn.Stat. § 524.3–407 (1984), contestants of a will have the burden of establishing undue influence. It is well settled that the will contestant must establish undue influence by clear and convincing proof. *In re Estate of Pundt*, 280 Minn. 102, 104, 157 N.W.2d 839, 841 (1968). Clear and convincing proof will be shown where the truth of the facts asserted is highly probable. *Weber v. Anderson*, 269 N.W.2d 892, 895 (Minn.1978).

In order for a court to find that someone exerted undue influence:

[t]he evidence must go beyond suspicion and conjecture and show, not only that the influence was in fact exerted, but that it was so dominant and controlling of the testator's mind that, in making the will, he ceased to act on his own free volition and became a mere puppet of the wielder of that influence.

*In re Estate of Reay*, 249 Minn. 123, 126–27, 81 N.W.2d 277, 280 (1957) (footnote omitted).

■ Direct evidence of undue influence is not required and is usually unobtainable because the influence is rarely exercised openly in the presence of others. *In re Estate of Olson*, 176 Minn. 360, 365, 223 N.W. 677, 679 (1929). Therefore, the circumstantial evidence must be sufficient to indicate undue influence. *Id.*

Among the factors important as bearing upon the fact of undue influence are the opportunity to exercise it, active participation in the preparation of the will by the party exercising it, a confidential relationship between the person making the will and the party exercising the influence, disinheritance of those whom the decedent probably would have remembered in his will, singularity of the provisions of the will, and the exercise of influence or persuasion to induce him to make the will in question.

*In re Estate of Wilson*, 223 Minn. 409, 413, 27 N.W.2d 429, 432 (1947).

■ After thoroughly reviewing the record in this case, we are left with the definite and firm conviction that the trial court mistakenly found that respondents satisfied their burden of establishing by clear and convincing proof that Reynolds exerted undue influence upon decedent. We do not consider that respondents presented sufficient evidence to meet their heavy burden of proof.

Reynolds did have the opportunity to exert undue influence while she was visiting her father in the hospital around the time when he executed the codicil. However, opportunity alone will not sustain a finding of undue influence. *In re Estate of Holden*, 261 Minn. 527, 113 N.W.2d 87 (1962). In this case, there is no conclusive evidence that anything more than the opportunity for undue influence existed.

Reynolds did not actively participate in the preparation of the codicil. Although she arranged the meetings between her father and Kaisershot, she was not present during these meetings. Kaisershot was not an attorney selected by Reynolds. He was her father's attorney of several years' standing. There was no evidence that

Reynolds instructed her father to execute a deed or a codicil. In addition, Kaisershot testified that decedent asserted that he wanted Reynolds alone to get the homestead.

██ Respondents argue that Reynolds' confidential relationship with her father is indicative of undue influence. Although a confidential relationship may be a factor indicating undue influence, any evidence of intimacy or affection between blood relatives "negatives rather than proves undue influence." *In re Estate of Marsden*, 217 Minn. 1, 11–12, 13 N.W.2d 765, 771 (1944). It is apparent that there was such intimacy and affection between Reynolds and decedent. Reynolds came to Minnesota each year for extended visits with decedent and decedent called her his "number one child." Therefore, the close relationship between Reynolds and decedent tends to refute a finding of undue influence.

Although decedent devised the bulk of his estate to Reynolds, he did not disinherit his other children. All five children shared equally in the remainder of the estate, including the coin and currency collections which decedent valued at $100,000. Therefore, decedent believed he was leaving a substantial amount to each of his other children. Decedent's belief that he adequately provided for his other children, coupled with the substantial evidence that Reynolds was his favorite child, lead us to conclude that decedent's division of his estate was not unusual or unexplainable. Hence, decedent's division of his estate does not indicate the exercise of undue influence upon him. *Accord In re Estate of Meehan*, 220 Minn. 1, 5, 18 N.W.2d 781, 783 (1945).

██ Respondents argue that Reynolds' failure to tell them about their father's illness indicates that she influenced him to execute the codicil. Although Reynolds may have behaved suspiciously, respondents offered no evidence of how Reynolds interacted with her father around the time the codicil was executed. Further, the evidence indicates that decedent, although physically weak, was alert and able to communicate while in the hospital. He also had enough mental vigor to refuse medicine he did not like and to assert that Reynolds should get the house. Consequently, any conclusion drawn from Reynolds' purported secrecy is mere suspicion and conjecture and does not establish undue influence. *See In re Estate of Reay*, 249 Minn. at 126–27, 81 N.W.2d at 280.

Upon a review of all the evidence, we believe that respondents did not meet their burden of establishing undue influence by clear and convincing proof. Among all the factors tending to show undue influence, respondents established only that Reynolds had an opportunity to exert undue influence. Absent evidence of some of the other factors, opportunity alone cannot sustain a finding of undue influence. *See In re Estate of Holden; In re Estate of Reay; In re Estate of Meehan; In re Will of Hess*, 48 Minn. 504, 51 N.W. 614 (1892). We do not lightly overturn trial court findings. However, we cannot disturb the presumed validity of a duly executed will or codicil unless the opponent offers clear and convincing proof of its invalidity.

### DECISION

The trial court erred in finding that decedent's second codicil was executed as a result of undue influence by the appellant.

Reversed.