**In re The ESTATE OF Willard S. McCUE, Deceased.**

**No. CX–89–809.**

Court of Appeals of Minnesota.

Jan. 2, 1990.

Charles K. Frundt, Blue Earth, for appellant, John McCue.

Bailey W. Blethen, Mankato, for respondent, Mark McCue.

Heard, considered and decided by HUSPENI, P.J., and SHORT and KLAPHAKE, JJ.

## OPINION

KLAPHAKE, Judge.

Decedent's will was admitted to formal probate October 11, 1988. On February 21, 1989, appellant moved the probate court for vacation of the order on the grounds of excusable neglect in having not earlier filed objections to the will. The court granted appellant's motion limited to a contest on the execution of the will, and denied a hearing on claims of undue influence and lack of testamentary capacity. Appellant challenges the court's partial denial of his motion, while respondent appeals the court's decision to vacate on any ground. We affirm in part, reverse in part, and remand.

## FACTS

Decedent Willard McCue (Willard), a retired farmer, had three sons, Paul, Mark and John, and one daughter, Sister Marilyn Marie McCue, S.S.N.D. Willard entered a nursing home in Cold Spring in October 1984, where, except for a six month period in 1985, he remained until his death on August 30, 1988.

On April 9, 1986, respondent Mark McCue (Mark) visited his father at the nursing home where the two discussed making changes in Willard's will. Mark then drove to Mankato to talk to Willard's attorney, Jack Regan, about the changes. Regan called Willard that afternoon, and the two talked for about ten minutes. After the conversation, Regan prepared a revised will. Along with the revised will, Regan prepared a letter detailing the changes made to the will, and the procedure for its proper execution.

The next day, Mark picked up the revised will and the letter from Regan and drove to Cold Spring to deliver them to his father at the nursing home. Mark claims to have then taken his father from the nursing home to the local bank to have the will executed. Two bank employees signed the will as witnesses, another notarized it.

After Willard's death, the witnesses stated in affidavits that although their signatures on the will were authentic, neither of them remembered ever seeing Willard, and that on April 10, 1986 they may have only witnessed the signature of the notary. The notary stated she did not think she had ever seen Willard in person, and that she

probably notarized the will at the request of a third party.

Willard's original will established a small trust for his daughter, and made several small distributions to his grandchildren, but divided the bulk of the estate equally between Mark and one of his brothers, appellant John McCue (John). Willard's third son, Paul, was not included in the will because of "the gifts, sales, and other provisions" made to him during Willard's lifetime. When the will was revised in April 1986, the trust and the smaller distributions were continued. Mark's share, however, represents approximately 97.5% of the estate or $470,000, while John's share is $5,000.

Willard died on August 30, 1988. A hearing on the petition for formal probate of will was held on October 11, 1988. John, who had recently been released from intensive care following a heart transplant, appeared at the hearing without counsel and requested a continuance of the hearing. The court denied the motion and entered an order for formal probate. On February 11, 1989, John moved to vacate the order for probate of the will. The court found that (1) John had a reasonable excuse for failing to object sooner to the allowance of Willard's will, (2) John had acted with due diligence in bringing his motion, and (3) no substantial prejudice would result to the estate by granting the motion. The order for formal probate of the will was vacated on a finding that objections to the execution of the will were meritorious. However, a hearing on claims of undue influence and lack of testamentary capacity was denied.

## ISSUE

Did the trial court abuse its discretion by granting appellant's motion to vacate the order for formal probate of decedent's will but limiting the hearing to the issue of its execution?

## ANALYSIS

Minnesota law provides:

[T]he [probate] court shall have power to correct, modify, vacate or amend its records, orders and decrees:

\* \* \* \* \* \*

\* \* \* [w]ithin two years after the date of filing of any record, order or decree, for excusable neglect, inadvertence or mistake. Minn.Stat. § 525.02(d) (1988).

The power of a probate court to vacate its order is the same as that of the district court. *In re Estate of Weber*, 418 N.W.2d 497, 501 (Minn.Ct.App.1988), *pet. for rev. denied* (April 4, 1988). An order denying a motion to vacate should not be reversed unless the denial constitutes an abuse of discretion. *Weber*, 418 N.W.2d at 502 (citing *Howard v. Frondell*, 387 N.W.2d 205, 207–08 (Minn.Ct.App.1986), *pet. for rev. denied* (Minn. July 31, 1986)).

To relieve a party from a final judgment for "excusable neglect" under Minn. R.Civ.P. 60.02, the Minnesota Supreme Court said:

[I]t is the duty of the trial court, *in furthering justice by adopting a liberal policy conducive to the trial of causes on their merits*, to grant a motion to open a \* \* \* judgment and permit a party to answer, if the party \* \* \* shows that he (a) is possessed of a reasonable defense on the merits, (b) has a reasonable excuse for his failure or neglect to answer, (c) has acted with due diligence after notice of the entry of judgment, and (d) that no substantial prejudice will result to the other party.

*Hinz v. Northland Milk & Ice Cream Co.*, 237 Minn. 28, 30, 53 N.W.2d 454, 455–56 (1952) (footnotes omitted) (emphasis in original). We conclude the same standard applies to a motion to vacate a probate order under Minn.Stat. § 525.02(d) (1988).

The trial court used the appropriate standard. The trial court found John "had a reasonable excuse for failing to object to the allowance of the will because of his health problems." The court also found John acted with due diligence in bringing his motion to vacate after he learned of the entry of judgment, and noted that Mark made no claim that he would be prejudiced by a hearing on the admissibility of the will

to probate. The court reasoned that contradictory evidence over the validity of the execution of the will gave rise to a "meritorious defense in favor of the contestants."

■ Respondent, however, argues that Willard's will was self-proved and, consequently, proper execution is conclusively presumed.

[C]ompliance with signature requirements for execution is conclusively presumed and other requirements of execution are presumed subject to rebuttal * * * unless there is proof of fraud or forgery affecting the acknowledgement or affidavit.

Minn.Stat. § 524.3–406(b) (1988).

Respondent acknowledges that this claim of conclusive "signature requirements" was not presented to the trial court. Nor did appellant argue at the trial level that the statements of witnesses and notaries established a fraud or forgery. The scope of review for an appellate court "is necessarily limited to issues which the record establishes were actually raised in, and decided by, the trial court. *In re Estate of Magnus*, 436 N.W.2d 821, 823 (Minn.Ct. App.1989) (citing *Thayer v. American Financial Advisers, Inc.*, 322 N.W.2d 599, 604 (Minn.1982)). "Where the parties fail to fully litigate an issue below, we cannot determine it on appeal." *Magnus*, 436 N.W.2d at 823 (quoting *Fryhling v. Acrometal Products, Inc.*, 269 N.W.2d 744, 747 (Minn.1978)). We decline to address respondent's arguments as outside the scope of review.

Whether or not the will here is a "self-proved" will, the execution irregularities claimed are substantial and support a colorable claim of fraud. We therefore find no abuse of discretion in the court finding a "meritorious defense in favor of the contestants."

■ Having determined to vacate the order for formal probate of will, the trial court limited the hearing to the question of its execution. The court concluded there was insufficient evidence to support John's claims that Willard lacked testamentary capacity and that Mark exercised undue influence over his father. We disagree and conclude the trial court erred in its analysis and application of the "reasonable defense on the merits" factor.

The trial court appeared to analyze the four *Hinz* factors as mutually exclusive. Although the right to relief from a judgment is not absolute, *Howard*, 387 N.W.2d at 207, it is not necessary that all four *Hinz* factors be satisfied equally.

In evaluating the existence and strength of these factors the relative weakness of one factor should be balanced against the strong showing on the other three.

*Gelco Corp. v. Crystal Leasing, Inc.*, 396 N.W.2d 672, 674 (Minn.Ct.App.1986) (citing *Guillaume Associates, Inc. v. Don–John Co.*, 371 N.W.2d 15, 19 (Minn.Ct.App.1985)).

A reasonable defense is presented if the moving party "raises a triable issue," *Lysholm v. Karlos*, 414 N.W.2d 773, 775 (Minn.Ct.App.1987), and presents "more than conclusory allegations in [the] moving papers." *Charson v. Temple Israel*, 419 N.W.2d 488, 491 (Minn.1988) (citing *In re Livingston's Estate*, 117 Minn. 421, 423–24, 136 N.W. 8, 9 (1912)). "The existence of a meritorious defense may be established in an affidavit or by other proof." *Grunke v. Kloskin*, 355 N.W.2d 207, 209 (Minn.Ct. App.1984) (citation omitted).

John offered evidence as to his father's age, physical infirmity, lack of vision and medical evidence as to his senility. In addition, John offered evidence as to 5 of the 6 factors bearing on a determination of undue influence outlined in *In re Wilson*, 223 Minn. 409, 413, 27 N.W.2d 429, 432 (1947). John's evidence included: (1) Mark's opportunity to exercise undue influence upon his father; (2) Mark's participation in the preparation of the will; (3) the confidential relationship between Mark and his father; (4) the disinheritance of John, to wit: total distribution of $5,000; and (5) the singularity of the provisions in Mark's favor, to wit: $470,000. John offered no direct evidence as to the exercise of influence or persuasion. However, "[d]irect evidence of undue influence is not required and is usually unobtainable because the influence is rarely exercised openly in the presence of oth-

ers." *In re Estate of Olson,* 176 Minn. 360, 365, 223 N.W. 677, 679 (1929). We find this evidence presents colorable claims supporting appellant's motion to vacate.

In its analysis of decedent's testamentary capacity and Mark's opportunity to exercise undue influence over his father, the dissent relies on affidavits presented by John Regan, decedent's attorney, and Eileen Froehle, a social worker at the nursing home. The fact remains, however, that no real discovery has yet taken place in this case. Inasmuch as appellant will be allowed further discovery on the circumstances surrounding the execution of the will, and in the interest of having cases decided on their merits, we conclude appellant should also be allowed to engage in discovery on the additional issues as well.

## DECISION

Inasmuch as the court found three of the *Hinz* factors clearly established, and vacated the order for formal probate of will, we find it was an abuse of discretion to limit the scope of the hearing on the merits to only one issue. We affirm vacation of the order for formal probate of the will. However, we reverse the disallowance of a hearing on the issues of testamentary capacity and undue influence and remand to allow John the opportunity to engage in pre-trial discovery and to raise all of his objections to his father's will at a full hearing on the merits. At the hearing on appellant's claim, however, the probate court is directed to determine: (1) whether the will is a self-proved will; and (2) if it is, whether the conclusive presumption as to signature requirements is inapplicable by fraud or forgery affecting the acknowledgement.

HUSPENI, J., concurs in part and dissents in part.

HUSPENI, Judge (concurring in part and dissenting in part).

I agree with the majority that "an order denying a motion to vacate should not be reversed unless the denial constitutes an abuse of discretion" and that the factors set forth in *Hinz v. Northland Milk & Ice Cream Co.,* 237 Minn. 28, 30, 53 N.W.2d 454, 455–56 (1952), are applicable to determine whether vacation is appropriate. However, because I believe there was no abuse of discretion, I would affirm each of the trial court's determinations.

In reviewing a motion to vacate, this court's scope of review is narrow:

A probate court's determination of a factual question is not to be set aside unless clearly erroneous * * * [O]n appeal facts are viewed in a light most favorable to the prevailing party [and] [t]he probate court's order denying [a] vacation request should not be reversed unless that denial was an abuse of discretion.

*Matter of Estate of Weber,* 418 N.W.2d 497, 501–02 (Minn.Ct.App.1988), *pet. for rev. denied* (Minn. April 4, 1988) (citations omitted).

To vacate an order, the moving party must show that he or she:

(a) is possessed of a reasonable defense on the merits, (b) has a reasonable excuse for his failure or neglect to answer, (c) has acted with due diligence after notice of the entry of judgment, and (d) that no substantial prejudice will result to the other party.

*Hinz v. Northland Milk & Ice Cream Co.,* 237 Minn. 28, 30, 53 N.W.2d 454, 456 (1952).

Regarding lack of testamentary capacity and undue influence, the majority concludes that the trial court abused its discretion in not vacating the probate order because it found three of the four *Hinz* factors. I respectfully dissent from the majority's determination on the issues of capacity and undue influence.

### I. *Hinz* Application

Dicta from *Gelco Corp. v. Crystal Leasing, Inc.,* 396 N.W.2d 672 (Minn.Ct.App. 1986) states:

In evaluating the existence and strength of [the *Hinz*] factors the relative weakness of one factor should be balanced against the strong showing on the other three.

*Id.* at 674 (citation omitted). I cannot interpret this dicta as stating that satisfaction of any three of the four *Hinz* factors re-

quires the granting of a motion to vacate. The *Gelco* court, in fact, indicated that:

> *Because* the trial court correctly found that appellant did not possess a reasonable defense on the merits, we also find that appellant's motion to vacate default judgment was properly denied.

*Id.* at 675 (emphasis added). Additionally, the *Gelco* court observed that even if the appellant in that case had established the other three factors for vacating a default judgment,

> the lack of a reasonable defense on the merits has not been compensated for by evidence on the other three * * *. *[A]ppellant's lack of a reasonable defense on the merits to respondent's claim itself leaves little logical reason to compel vacation of default judgment.*

*Id.* (emphasis added). I submit that under *Gelco*, while three of the four *Hinz* factors may be sufficient to grant a vacation, those three should include a reasonable claim on the merits.

### II.

A reasonable claim must be more than mere "conclusory allegations in moving papers." *Charson v. Temple Israel*, 419 N.W.2d 488, 491 (Minn.1988) (citation omitted). Additionally,

> [T]o the end that a defaulting defendant may not trifle with the court, it is required that he shall in some manner, in good faith, make a showing of facts, which if established will constitute a good defense. Sound practice requires, as a showing, something more than * * * [an] unverified statement.

*Frontier Lumber & Hardware, Inc. v. Dickey*, 289 Minn. 162, 164, 183 N.W.2d 788, 790 (1971) (citation omitted).

### A. TESTAMENTARY CAPACITY

On the issue of testamentary capacity, the trial court stated:

> Contestants allege no specific instances or facts which support the contention that the testator did not know the extent of his property or that he lacked the ability to make a rational judgment. Af-

fidavits provided on behalf of the proponents specifically indicate that the testator had testamentary capacity at the time of execution and therefore the contestants have failed to show a reasonable claim on the merits concerning their objection for lack of testamentary capacity.

Appellant attempted to support his contention that the decedent lacked testamentary capacity by citing the decedent's age, physical infirmity, lack of vision and the fact that the decedent had had a major operation shortly before the execution of his will. However, appellant's allegations are unrelated to the issue of testamentary capacity. The Minnesota Supreme Court has stated:

> It is the generally recognized rule that testamentary capacity requires only that the testator have capacity to know and understand the nature and extent of his bounty, as distinguished from the requirement that he have actual knowledge thereof.

*In re Estate of Jenks*, 291 Minn. 138, 141, 189 N.W.2d 695, 697 (1971). *See also Matter of Estate of Congdon*, 309 N.W.2d 261, 266 (Minn.1981). Because appellant did not relate decedent's physical condition to his mental acuity, specifically to his ability to "know and understand the nature and extent of his bounty," appellant stated nothing more than the insufficient "conclusory allegations" warned against in *Charson*.

Appellant did produce a notation from a doctor who, while examining decedent for an unrelated matter, observed that decedent appeared to be senile. This is in direct contradiction to statements made by decedent's attorney, John Regan:

> During that telephone conference, Willard McCue [decedent] advised me of changes he wanted to make in the Will he had executed December 27, 1983. *He clearly understood and explained to me what his present Will provided and why he wanted to change it.*

(Emphasis added.) However, assuming senility were an issue, to demonstrate lack of testamentary capacity the senility must affect the decedent's capacity to "know and understand the nature and extent of his

bounty." *See Jenks,* 291 Minn. at 141, 189 N.W.2d at 697; *see also Matter of Estate of Olsen,* 357 N.W.2d 407 (Minn.Ct.App. 1984) (a woman who was only "relatively lucid" possessed testamentary capacity), *pet. for rev. denied* (Minn. Feb. 27, 1985). Here, appellant failed to connect the alleged senility with decedent's testamentary capacity.

Because we must view the evidence in the light most favorable to the trial court's determination, *see Weber,* 418 N.W.2d at 501, and because appellant's allegations, even if established, do not address decedent's testamentary capacity, appellant has not made a reasonable claim on the merits. Without such a claim, the trial court did not err in denying the motion to vacate on this ground.

### B.  UNDUE INFLUENCE

To establish undue influence,

[t]he evidence must go beyond suspicion and conjecture and show, not only that the influence was in fact exerted, but that it was so dominant and controlling of the testator's mind that, in making the will, he ceased to act of his own free volition and became a mere puppet of the wielder of that influence.

*In re Estate of Tourville,* 366 N.W.2d 380, 381 (Minn.Ct.App.1985), *pet. for rev. denied* (Minn. June 27, 1985) (citation omitted).  Factors to consider in evaluating undue influence include:

[1]  the opportunity to exercise it,

[2]  active participation in the preparation of the will by the party exercising it,

[3]  a confidential relationship between the person making the will and the party exercising the influence,

[4]  disinheritance of those whom the decedent probably would have remembered in [the] will,

[5]  singularity of the provisions of the will, and

[6]  the exercise of influence or persuasion to induce [the testator] to make the will in question.

*Tourville,* 366 N.W.2d 381–82 (quoting *In re Estate of Wilson,* 223 Minn. 409, 413, 27 N.W.2d 429, 432 (1947)).  Here, the trial court stated:

The contestants have not offered any evidence to indicate that influence was, in fact, exerted or that the testator ceased to act of his own free will except suspicion, conjecture and opportunity for the exertion of undue influence, and therefore the contestant has not shown that he has a reasonable defense on the merits concerning the objection based on undue influence.

Concerning undue influence, appellant's affidavit stated:

2.  That on April 9, 1986, Willard S. McCue was unable to leave the nursing home without assistance [1] and that on said date Mark McCue took his father out of the nursing home for a period of approximately 3 hours.

3.  That on April 10, 1986, attorney, John E. Regan directed a letter to Willard S. McCue at Delavan, Minnesota, a copy of which is attached to this affidavit and that said letter was picked up by Willard S. McCue's son, Mark McCue.

4.  That the purported Last Will and Testament of Willard S. McCue was purportedly executed on April 10, 1986, the same day on which the letter was directed to him by John Regan.

\*     \*     \*     \*     \*     \*

6.  That the nursing home telephone records of Cold Springs, Minnesota, indicate that for the months of March and April, 1986, no phone calls were made to Attorney Regan; [2] that the decedent did not have a phone in his room and if a call was to be made from the nursing home it would have to have been placed from a phone in a public area at the nurse's station; that the decedent could not have placed a call on April 9, 1986, without the

---

1.  This allegation is directly contrary to the affidavit of Eileen Froehle, who stated that "Willard [the decedent] would not have needed assistance to leave the [nursing home]."

2.  It is apparent from the phone bill attached to Regan's affidavit that the phone call was made from Regan's office to the nursing home.

assistance of others due to his mental and physical condition; that there are no memorandums in the nursing home records indicating such assistance was given.

These statements, even if established, would not give rise to a meritorious claim. An application of the *Tourville* factors to the appellant's allegation indicates that:

(1) While Mark had opportunities to exercise undue influence, "opportunity alone will not sustain a finding of undue influence." *Matter of Estate of Rechtzigel*, 385 N.W.2d 827, 832 (Minn.Ct.App.1986) (citation omitted). Appellant made no allegation that Mark used any of his opportunities to exercise undue influence.

(2) Mark participated in the preparation of the will. He told his father's attorney, Jack Regan, that his father wished to change his will, and the next day, Mark brought the revised will to his father for his signature. However, for participation to be evidence of undue influence, it must be "active." *See Tourville*, 366 N.W.2d at 381. Where one sibling arranged the meetings between her father and her father's attorney, who was not chosen by the sibling, and where there was no evidence that the sibling told her father what to put in the codicil, the court held that there was no "active participation." *Matter of Estate of Anderson*, 379 N.W.2d 197, 200 (Minn.Ct. App.1985), *pet. for rev. denied* (Minn. Feb. 19, 1986). This is very similar to Mark's level of participation in the preparation of the will. Mark acted as decedent's courier or information conduit, but there is no allegation that he participated in the actual drafting of the new will.

(3) There may have been a confidential relationship between the father and son, but appellant makes no claim that decedent was in any way dependent on Mark, much less dependent to an extent that would make decedent a "mere puppet" in Mark's hands. Further, Regan stated in an affidavit that "[i]n my experience, he [decedent] was a very strong-willed individual whose opinions were firmly held." Finally, "any evidence of affection or intimacy between blood relatives negatives rather than

proves undue influence." *Anderson*, 379 N.W.2d at 201 (citation omitted).

(4) The fourth factor examines whether there has been a disinheritance of those whom the decedent probably would have remembered in his will. This court has observed that "it is not uncommon for a farmer's will to favor the child who carries on the family farming operation." *In re Estate of Larson*, 394 N.W.2d 617, 619 (Minn.Ct.App.1986), *pet. for rev. denied* (Minn. Dec. 12, 1986). Regan's letter, which was delivered to decedent with the revised will, stated:

This letter will also serve to confirm our telephone discussion of yesterday, wherein you told me about your concerns and the primary reasons for your wanting to change the Will at this time. I understand that you are right now very concerned about your son John, his second marriage, and the possibility that, under your previous Will, John would receive the 80 acre farm and the 40 acre farm and substantial cash and that, in the event of John's untimely death or dissolution of marriage, that property could pass to his second wife and/or her children rather than staying in the McCue family. I do recall from several discussions with you over the years that you have a strong desire to retain your estate, especially the land, in the McCue family name to the extent reasonably possible.

By affidavit Regan also stated:

Historically, [decedent] made no changes in his estate plan without first discussing them with me at some length. * * * It was the activities of certain members of his immediate family which caused him to make changes in his estate plan from time to time.

Given the above facts, the idea that appellant is one "whom the decedent probably would have remembered in the will" is conclusory. Under the revised will, decedent's church, his daughter, and his grandchildren each receive the same amount of money as they would have under the superseded will. The only person whose share of the estate has been diminished is appellant, and for this Regan's letter provides an explanation.

(5) The fifth factor examines the singularity of the revised will's provisions. The revised will devises most of the estate to Mark.

(6) Appellant lacks any evidence of a specific instance in which Mark exercised undue influence. The evidence presented in the record supports the proposition that Mark did not exercise any undue influence. Mark was not with the decedent when the decedent talked to Regan.[3]

In evaluating the six factors, appellant offers evidence establishing only the singularity of the provisions of the will. A meritorious claim of undue influence is not supported simply by noting that the will left a larger share of the estate to one sibling than the others. I submit that the trial court did not abuse its discretion in determining that appellant failed to offer evidence that would constitute a viable claim of undue influence.

CONCLUSION

Vacation of a default judgment is ultimately a matter largely within the trial court's discretion and should not be reversed on appeal absent a clear abuse of discretion. I find no abuse of discretion in any of the trial court's determinations and would affirm that court's opinion in its entirety.

---

**3.** Regan talked to decedent about twenty minutes after meeting with Mark; the distance from

Mankato to Cold Spring, where the decedent was at that time, is about 120 miles.